# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

No. 03-3438

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ROBERT A. SOY,

*Defendant-Appellant.*

No. 04-1218

ROBERT A. SOY,

*Petitioner-Appellant,*

*v.*

UNITED STATES OF AMERICA,

*Respondent-Appellee.*

_____

Appeals from the United States District Court for
the Northern District of Indiana, Hammond Division.
Nos. 92 CR 42 & 00 C 624—**Rudy Lozano**, *Judge.*

_____

ARGUED SEPTEMBER 8, 2004—DECIDED JUNE 28, 2005

_____

Before POSNER, RIPPLE and WOOD, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Robert A. Soy was convicted on
arson and explosives charges and was sentenced to life im-

prisonment; after two appeals, Mr. Soy's sentence was reduced to 528 months. A subsequent motion pursuant to 28 U.S.C. § 2255—the basis for the present appeal—resulted in a Pyrrhic victory for Mr. Soy: The district court granted Mr. Soy relief with respect to one of his convictions, but resentenced him to the same term of imprisonment. In this consolidated appeal, Mr. Soy challenges the district court's judgment with respect to substantive relief and to sentencing. For the reasons set forth in the following opinion, we affirm the judgment of the district court, but order a limited remand pursuant to *United States v. Paladino*, 401 F.3d 471 (7th Cir. 2005).

# I

# BACKGROUND

## A. Facts

We have set forth the facts relevant to this litigation in two prior opinions, *United States v. Prevatte* ("*Prevatte I*"), 16 F.3d 767 (7th Cir. 1994), and *United States v. Prevatte* ("*Prevatte II*"), 66 F.3d 840 (7th Cir. 1995). We assume familiarity with those opinions and, consequently, recount only those facts essential to the disposition of Mr. Soy's present claims.

In 1991, Russell Prevatte, Douglas Bergner, Jerry Williams and Mr. Soy embarked on a series of burglaries, some successful and some not. Later in the same year, Mr. Soy discussed with Williams—who was attending the Indiana State Police Academy at the time—and also with Prevatte the possibility of using pipe bombs as diversions for burglaries. If events went as the men planned, a bomb detonated in one area would divert emergency personnel to the area of the resulting fire; this diversion would prevent police from responding—or, at the least, responding in a timely fashion—to a burglary in another area.

On December 23, 1991, the first pipe bomb was detonated in the alley behind a single-family dwelling in Hammond, Indiana. This bomb was designed as a test to determine the response time of emergency personnel. Fragments from the bomb killed the resident of the home, Emily Antkowicz, and also punctured the gas meter attached to her house approximately fifty feet away. After this first bombing, the group decided to target gas meters because the possibility of resulting leaks and collateral damage drew a larger- than-expected number of people to the area.

On December 30, 1991, the men set off a second pipe bomb. The bomb was attached to a bank of gas meters at the rear of Edo's Lounge in Highland, Indiana, which was open to patrons at the time. The explosion caused a gas fire that damaged the lounge. This bomb was designed as a diversion for an attempted, but unsuccessful, burglary at an Aldi grocery store.

The following day, a bomb exploded near the gas meter behind Salvino's Restaurant in Hammond, Indiana. The explosion caused a fire which damaged the meters as well as the rear wall of the restaurant. Fragments from the explosion caused additional damage. The bomb was designed to frighten away the occupants of the apartment above the restaurant who might witness the group's attempt to burglarize a neighboring liquor store.

A fourth bomb was designed as a diversion for another unsuccessful burglary, this time of a currency exchange. The pipe bomb exploded under the gas meters of a multi-family apartment building in Hammond. Fragments from the bomb damaged the apartment building.

The final bomb was a diversion for the burglary of an Aldi grocery store. On January 5, 1992, the bomb exploded under the gas meters at an apartment building in Hammond. The

explosion damaged the meter attached to the apartment building as well as a nearby single-family home.

### B. Proceedings Before the District Court and on Direct Appeal

A grand jury returned a twenty-one count indictment against Prevatte and Mr. Soy. Relevant to the issues currently before this court, Count 1 charged Mr. Soy with engaging in a conspiracy to maliciously damage or destroy property by means of an explosive in violation of 18 U.S.C. § 844(i); the overt acts in furtherance of the conspiracy were each of the bombings set forth above. Count 2 charged Mr. Soy with a violation of 18 U.S.C. § 844(i) with respect to the bombing of Emily Antkowicz's home.[1] Counts 6, 10, 14 and 18 each charged a violation of § 844(i) based on the other bombings.[2] A jury convicted Mr. Soy on all of these counts.

---

[1]  Specifically, Count 2 charged:

> On or about December 23, 1991, . . . Russell "Rusty" Prevatte, Robert A. Soy and Jerry Williams defendants herein, did maliciously damage and destroy, or attempt to damage and destroy, by means of an explosive, to wit: a pipe bomb, a building or other real and personal property located at 1425 Stanton, Hammond, Indiana which was used in or affected interstate commerce, which resulted in the death of Emily Antkowicz . . . .

R.1 at 7.

[2]  Count 6 charged Prevatte and Mr. Soy with maliciously damaging and destroying, or attempting to damage and destroy, by means of an explosive, a building and other real or personal property located at Edo's Lounge, R.1 at 11; Count 10 charged Bergner, Prevatte and Mr. Soy with maliciously damaging or destroying, or attempting to damage and destroy, by means of an
(continued...)

The district court sentenced Mr. Soy to life imprisonment. Specifically, the district court determined, in accordance with the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"), that Mr. Soy should be sentenced to life imprisonment on Count 2. According to the Guidelines, the sentences on the remainder of the counts were to run concurrently with the sentence on Count 2 because "the sentence imposed on the count carrying the highest statutory maximum [wa]s adequate to achieve the total punishment." U.S.S.G. § 5G1.2.[3]

---

[2] (...continued)
explosive, a building and other real and personal property located at Salvino's Restaurant, *id.* at 15; Count 14 charged Bergner, Prevatte and Mr. Soy with maliciously damaging and destroying, or attempting to damage and destroy, by means of an explosive, a building and other real and personal property located at 6150 Harrison Avenue, *id.* at 19; and Count 18 charged Bergner, Prevatte and Mr. Soy with maliciously damaging and destroying, or attempting to damage and destroy, by means of an explosive, a building and other real and personal property located at 1608 169th Street, *id.* at 23.

As noted above, each of these acts, as well as the bombing resulting in the death charged in Count 2, were charged as overt acts "in furtherance of the conspiracy" charged in Count 1; Count 2 corresponded to the fourth overt act; Count 6 corresponded to the eighth overt act; Count 10 corresponded to the tenth overt act; Count 14 corresponded to the eleventh overt act; and Count 18 corresponded to the fifteenth overt act. R.1 at 2-4.

[3] Guideline § 5G1.2, "Sentencing on Multiple Counts of Conviction," provided as follows:

(a) The sentence to be imposed on a count for which the statute mandates a consecutive sentence shall be determined and imposed independently.

(continued...)

Mr. Soy and the other defendants appealed their convictions and sentences. With respect to his sentence, Mr. Soy argued that the district court erred when it cross-referenced the first degree murder guideline with respect to Count 2—the bombing that resulted in the death of Emily Antkowicz. We rejected this argument and held that "the bombing at issue [wa]s sufficiently similar to arson to apply the first

---

[3] (...continued)

   (b) Except as otherwise required by law (see § 5G1.1(a), (b)), the sentence imposed on each other count shall be the total punishment as determined in accordance with Part D of Chapter Three, and Part C of this Chapter.

   (c) If the sentence imposed on the count carrying the highest statutory maximum is adequate to achieve the total punishment, then the sentences on all counts shall run concurrently, except to the extent otherwise required by law.

   (d) If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment. In all other respects sentences on all counts shall run concurrently, except to the extent otherwise required by law.

U.S.S.G. § 5G1.2 (1991).

Neither the Guidelines nor the commentary provides an explicit definition for "total punishment"; however, the commentary to the current version of the Guidelines explains what is meant by this term: "The combined length of the sentences ('total punishment') is determined by the court after determining the adjusted combined offense level and the Criminal History Category." U.S.S.G § 5G1.2, application note 1 (2004). Additionally, this court has explained that "total punishment" corresponds to the sentence calculated by the district court in accordance with the application instructions set forth in § 1B1.1 of the Guidelines. *See United States v. De La Torre*, 327 F.3d 605, 609 (7th Cir. 2003).

degree murder guideline on this basis." *Prevatte I*, 16 F.3d at 780. We explained:

> [Section] 2A1.1. is the most analogous guideline when death results from a violation of § 844(i) from use of *fire*. Furthermore, on the basis of our reading of the legislative history, we do not believe the fact that death results from an *explosion*, and not a fire, alters the outcome. As we have noted, Congress intended that fire and explosive be equivalents for purposes of § 844(i). . . . Congress understandably equated the killing of a human being by burning and the killing of a human being by explosion. Thus, we conclude that the court correctly applied the first degree murder guideline.

*Id.* at 782 (emphasis in original; footnote omitted). Although this court agreed with the district court's application of the first degree murder guideline, we could not uphold the district court's imposition of a life sentence. We explained that 18 U.S.C. § 34 prevents a district court from imposing a life sentence without a jury recommendation. Consequently, we remanded for resentencing.

On remand, the district court imposed a sentence of 636 months. Mr. Soy again appealed his sentence. One of the issues raised on appeal was whether the district court complied with this court's mandate in resentencing the defendants. We held that the district court had done so. We stated that

> [i]n our earlier appeal, we . . . directed the district court to consider the applicability of application note 1 to § 2A1.1 of the Guidelines. . . . [T]hat note provides that, when the conviction of first degree murder is predicated on a theory other than premeditated killing, life imprisonment is not necessarily the appropriate sentence and that, in such circumstances, a downward

departure "may be warranted." Our direction to the district court, therefore, was to consider whether, on the facts of this case, a downward departure was warranted. . . . [T]he district court effectively carried out this court's order by departing to an extent based upon the defendants' "state of mind (recklessness or negligence), the degree of risk inherent in the conduct, and the nature of the underlying offense conduct." U.S.S.G. § 2A1.1, comment. (n.1).

*Prevatte II*, 66 F.3d at 844. However, Mr. Soy argued that, once the district court made the decision to depart, it was obliged "to impose a sentence that would have been imposed for second degree murder." *Id.* According to Mr. Soy, because the district court found that "the placement and detonation of the bomb amounted to 'recklessness and reckless state of mind and behavior,'" his conduct could be equated only with second degree murder. *Id.* We, again, rejected this argument:

We do not read application note 1 as cabining the discretion of the district court to that degree. The application note quite explicitly suggests that a departure below that prescribed for second degree murder or for the underlying offense is not likely to be appropriate. This notation is hardly a directive to the district court that any departure must, as a matter of law, reduce the sentence to the level of second degree murder. To hold that a departure must correspond to the base offense level stipulated in § 2A1.2, Second Degree Murder, every time the court finds that a defendant's mental state was less than "intentionally or knowingly," *cf.* U.S.S.G. § 2A1.1, comment. (n. 1), would negate the congressional determination that death resulting from certain felonies, such as arson, should be punished, not as second degree murder, but as first degree murder. . . .

Indeed, the district court's redetermination of the sentence in this case demonstrates the need for the flexibility that the application note gives to a sentencing court. The district court commented quite extensively on the mental state of the defendants at the time of the crime. . . . This analysis can be read as a determination by the district court that the defendants engaged in conduct that, although not premeditated, involved a high degree of recklessness and warranted punishment between the level that would be employed for premeditated murder and the level that would be employed for a murder committed recklessly but not in the aggravated manner exhibited here. Such a determination is clearly permissible under the congressional determination concerning the punishment of murder committed in the course of arson. The sentence corresponds to an offense level of 42, which provides that an individual be sentenced to "360 [months]-life."

*Id.* at 844-45. Although the district court fully complied with this court's mandate, we remanded so that the district court could "adjust the sentence to ensure that the life expectancy of each of the defendants" had been appropriately considered as required by intervening case law—specifically *United States v. Martin*, 63 F.3d 1422 (7th Cir. 1995). *Prevatte II*, 66 F.3d at 846.

On remand, the district court imposed a sentence of 528 months' imprisonment. Specifically, the court ordered Mr. Soy "committed to the custody of the Bureau of Prisons to be imprisoned for a term of 528 months on Count 2; and a term of 60 months on Count 1; and terms of 120 months on each of Counts 6, 7, 8, 10, 11, 12, 14, 15, 16, 18, 19 and 20, all to be served concurrently." Tr.XII at 19-20. Again, the court's sentencing order followed the Guidelines' directive that lesser sentences be served concurrently "[i]f the sen-

tence imposed on the count carrying the highest statutory maximum [wa]s adequate to achieve the total punishment." U.S.S.G. § 5G1.2(c) (1995). Mr. Soy did not appeal this sentence.

## C. Section 2255 Proceedings

In 2002, Mr. Soy instituted the present § 2255 action in which he challenged his § 844(i) convictions on the basis of the Supreme Court's decision in *Jones v. United States*, 529 U.S. 848 (2002).[4] The district court granted Mr. Soy's petition with respect to Count 2 of the indictment. The district court noted that Count 2 charged Mr. Soy with destroying or attempting to destroy "a building *or* other real and personal property located at 1425 Stanton." R.1 at 7 (emphasis added). The court stated:

> At trial, the Government presented evidence that Petitioner destroyed or attempted to destroy a building, Emily Antkowicz's residence, as well as personal property, the NIPSCO meter, located at 1425 Stanton. Contrary to the Government's position, it does not follow that in finding Petitioner guilty of Count 2 the jury had to consider the damage to the NIPSCO meter as affecting interstate commerce because at that time *United States v. Stillwell*, 900 F.2d 1104, 1110 n.2 (7th Cir. 1990), was controlling law. *Stillwell* held that the bombing of a private home supplied by natural gas from outside the state has a sufficient nexus to interstate commerce under section 844(i). Thus, the jury did not even have to consider the damage to the NIPSCO meter in order to find Petitioner guilty on Count 2.

---

[4] **Mr. Soy brought other claims such as ineffective assistance of counsel on his third resentencing; however, he does not raise those issues in the present appeal.**

Therefore, the jury could have based its decision to convict Petitioner based on the damage to either the residence, the NIPSCO meter, or both. The problem is that there is nothing in the indictment, jury instructions or verdict forms to allow this Court to ascertain what the jury determined was damaged to warrant convicting Petitioner on Count 2. Any such determination by this Court would be speculation at best. . . . Because Petitioner may have been convicted of Count 2 for bombing the residence at 1425 Stanton, Petitioner may be convicted for conduct that Congress did not intend to be covered by section 844(i). Consequently, the verdict finding Petitioner guilty of Count 2 is VACATED.

R.61 (No. 04-1218) at 15-16.

However, the court determined that the same was not true with respect to Count 1. With respect to that conspiracy count, the court noted that the jury was required only to find one overt act in furtherance of the conspiracy in order to convict Mr. Soy. The fourth overt act alleged that

[o]n or about December 23, 1991 . . . Robert A. Soy, did maliciously damage and destroy, by means of an explosive, to wit: a pipe bomb, a building *and* other real *and* personal property located at 1425 Stanton, Hammond, Indiana which property was used in or affected interstate commerce, which resulted in the death of Emily Antkowicz.

R.1 at 2 (emphasis added). Although this alleged act was similar to that alleged in Count 2, the court continued,

there is one crucial difference; Count 2 is phrased in the disjunctive while the fourth overt act of Count 1 is phrased in the conjunctive. . . .

Unlike the problem faced in Count 2, there is no ambiguity presented in the fourth overt act of Count 1.

> It is evident that, if the jury convicted Petitioner on Count 1 by relying on the fourth overt act, such a finding would necessarily be based on Petitioner damaging both the residence and NIPSCO meter at 1425 Stanton. Because the fourth overt act requires the jury to find Petitioner damaged the NIPSCO meter, any mention of the residence is not of consequence. . . . Therefore, Petitioner's conviction of Count 1 remains.

R.61 (No. 04-1218) at 17-18.

The court then turned to the matter of resentencing. The court determined that Emily Antkowicz's death was relevant conduct to the conspiracy for which Mr. Soy was convicted in Count 1. However, the district court was confined by the holding of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), not to exceed the statutory maximum for any one of the still-viable counts. Therefore, the district court ordered that the sentences on the remaining counts run consecutively, as opposed to concurrently, as directed by U.S.S.G. § 5G1.2(d),[5] to account for the seriousness of Mr. Soy's crimes.

Mr. Soy timely appealed his resentencing. He also sought, and was granted, a certificate of appealability with respect to the district court's denial of § 2255 relief on Count 1— the conspiracy count. The cases were consolidated for appeal.

---

[5]    As in earlier versions of the Guidelines, U.S.S.G. § 5G1.2(d) (2002) provided:

> If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment. In all other respects, sentences on all counts shall run concurrently, except to the extent otherwise required by law.

## II

## DISCUSSION

### A. Failure to Vacate Substantive Counts

#### 1. Interstate Commerce Requirement after *Jones*

Mr. Soy first maintains that the district court erred in failing to vacate his conviction on Count 1 on the same grounds that it vacated Count 2. According to Mr. Soy, this conviction suffers from the same interstate commerce infirmity as did his conviction on Count 2.[6] He therefore submits that, in accordance with the Supreme Court's decision in *Jones*, 529 U.S. 848, his conviction on Count 1 also must be vacated. We begin our analysis with an overview of *Jones*.

In *Jones* the Supreme Court faced the question of whether an owner-occupied residence was a building "used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce," as that language is used in 18 U.S.C. § 844(i).[7] *Jones* held that the requirement that the

---

[6] As explained in some detail earlier in this opinion, the district court vacated Count 2 based only on the possibility of a missing interstate commerce connection; in its view, because of the wording of the indictment, it was possible that the jury could have convicted Mr. Soy based on the damage to the dwelling at 1425 Stanton, which lacked the necessary interstate commerce nexus. There is no question, however, that the rest of the elements of Count 2 were proven, namely that Mr. Soy "maliciously damage[d] or destroy[ed], or attempt[ed] to damage and destroy, by means of an explosive, to wit: a pipe bomb, a building or other real and personal property located at 1425 Stanton . . . which resulted in the death of Emily Antkowicz." R.1 at 7.

[7] 18 U.S.C. § 844(i) states in relevant part:

Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in

(continued...)

building or property at issue be "used in interstate or foreign commerce" "is most sensibly read to mean active employment for commercial purposes, and not merely a passive, passing, or past connection to commerce." *Jones*, 529 U.S. at 855. The Court noted that the proper inquiry "is into the function of the building itself, and then a determination of whether that function affects interstate commerce." *Id.* at 854 (internal quotation marks and citations omitted). Turning to the facts of the case before it, the Court determined that, with respect to the arson of a private residence, "[i]t surely is not the common perception that a private, owner-occupied residence is 'used' in the 'activity' of receiving natural gas, a mortgage, or an insurance policy." *Id.* at 856. The Court therefore held that § 844 covers only property currently used in commerce or in an activity affecting commerce. The home owned and occupied by petitioner Jones's cousin was not so used—it was a dwelling place used for everyday family living. As we read § 844(i), Congress left cases of this genre to the law enforcement authorities of the States. *Id.* at 858.[8]

Although *Jones* excluded single-family dwellings from the scope of § 844(i), it left undisturbed a prior holding of the Court that *rental* property satisfies the "used in" require-

---

[7] (...continued)
interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned for not less than 5 years and not more than 20 years, fined under this title, or both . . . .

[8] This holding overruled longstanding Seventh Circuit precedent that had not required active use in commerce, but only had required some connection to interstate commerce. The culmination of this precedent was *United States v. Stillwell*, 900 F.2d 1104 (7th Cir. 1990), in which this court had concluded that, if a private residence received natural gas from out of state, that was sufficient to establish the necessary nexus.

ment of § 844(i). *See id.* at 856 (citing *Russell v. United States*, 471 U.S. 858, 862 (1985)). In *Jones*, the Court explained that its earlier

> decision in *Russell* does not warrant a less "use"-centered reading of § 844(i). In that case, which involved the arson of property rented out by its owner, the Court referred to the recognized distinction between legislation limited to activities "in commerce" and legislation invoking Congress' full power over activity substantially "affecting . . . commerce." The *Russell* opinion went on to observe, however, that "[b]y its terms," § 844(i) applies only to "property that is 'used' in an 'activity' that affects commerce." "The rental of real estate," the Court then stated, "is unquestionably such an activity."

*Id.* (quoting *Russell*, 471 U.S. at 859-60, 862); *see also Martin v. United States*, 333 F.3d 819, 821 (7th Cir. 2003) (observing that *Jones* did not disturb *Russell*'s holding that rental property satisfies the interstate commerce requirement of § 844(i)).[9] Thus, although *Jones* removed owner-occupied residences from the scope of § 844(i), it did not disturb the holding of *Russell* that rental properties satisfy the interstate commerce requirement.

---

[9] In *Russell v. United States*, 471 U.S. 858, 862 (1985), the Court stated:

> By its terms . . . the statute only applies to property that is "used" in an "activity" that affects commerce. The rental of real estate is unquestionably such an activity. We need not rely on the connection between the market for residential units and "the interstate movement of people," to recognize that the local rental of apartment units is merely an element of a much broader commercial market in rental properties. The congressional power to regulate the class of activities that constitutes the rental market for real estate includes the power to regulate individual activity within that class.

The per se rule announced in *Russell* has been applied outside the rental property context. In *United States v. Joyner*, 201 F.3d 61 (2d Cir. 2000), the Second Circuit extended the rule to bars and restaurants. It explained:

> [T]he Court [in *Russell*] adopted a *per se* rule that rental property affects interstate commerce under Section 844(i).
>
> *Russell* mandates the adoption of a similar *per se* rule regarding bars or restaurants. The rationale is identical—if "the local rental of an apartment unit is merely an element of a much broader commercial market in rental properties," [*Russell*, 471 U.S.] at 862, then the local operation of a restaurant is merely an element of a much broader commercial market of food and drink delivery. Here, the building torched included a restaurant. Thus, although the government concedes that it failed to introduce any direct evidence at trial to show that Dell's obtained food or beverage from out-of-state sources or catered to interstate patrons, the jury properly concluded that Dell's was part of a broader restaurant market connected to interstate commerce.

*Id.* at 79 (parallel citation omitted). Our own court has cited *Joyner* with approval and also has recognized, in dicta, the application of *Russell*'s per se rule to other commercial enterprises:

> It remains true after *Jones* that buildings actively used for a commercial purpose, including restaurants, *United States v. Joyner*, . . . home offices, *United States v. Jimenez*, 256 F.3d 330 (5th Cir. 2001), church daycare centers, *United States v. Terry*, 257 F.3d 366, . . . (4th Cir. 2001), and temporarily vacant rental properties, *United States v. Williams*, 299 F.3d 250 (3d Cir. 2002), all possess the requisite nexus with interstate commerce under § 844(i).

> And so it is here, notwithstanding Martin's protestations that no paying tenants resided in his apartment building at the time of the fire.

*Martin*, 333 F.3d at 821. Following *Joyner* and the dicta in *Martin*, we hold that the per se rule set forth in *Russell* applies equally to restaurants and bars, and, consequently, buildings housing these establishments are "used in" interstate commerce for purposes of § 844(i).

### 2. Application of Interstate Commerce Requirement

Mr. Soy maintains that the Government failed to establish an interstate commerce nexus with respect to all of the bombings charged as overt acts, and, therefore, the conviction on the conspiracy count (Count 1) must be vacated. According to Mr. Soy, the only interstate commerce nexus that the Government proved with respect to any of the charged overt acts was the receipt of natural gas, which, as set forth in *Jones*, is insufficient to satisfy the jurisdictional requirement.[10]

---

[10] Mr. Soy's interstate commerce argument focuses on the Government's alleged failure to prove an overt act that affects interstate commerce. He does not argue that the Government was required to prove specific intent on his part to damage or destroy a building used in interstate commerce, nor do we believe that such an argument would be availing. *See United States v. Muza*, 788 F.2d 1309, 1311-12 (8th Cir. 1986) (rejecting argument that government was required to prove that defendant had actual knowledge that target of § 844(i) conspiracy was used in interstate commerce); *cf. United States v. Jimenez*, 256 F.3d 330, 338 n.9 (5th Cir. 2001) ("We are not persuaded that a defendant need have any knowledge of a building's effect on interstate commerce in order to be convicted under § 844(i)."); *United States v. Gullett*, 75 F.3d

(continued...)

The Government counters that, with the exception of the fourth overt act (the bombing at the Antkowicz residence), each of the overt acts involved damage to real property that was "used in" interstate commerce as defined in *Jones* and that those connections satisfy the interstate commerce requirement. We conclude that, as a matter of law, the buildings that were the targets of the other pipe bombs were "used in" interstate commerce for the purposes of § 844(i). Therefore, *Jones* does not require us to disturb Mr. Soy's conviction on Count 1.

### a.  bombing at Edo's Lounge

One of the overt acts charged in furtherance of the conspiracy was the bombing of Edo's Lounge on December 30, 1991. Mr. Soy maintains that

> [t]here was no evidence that the building was damaged in the first instance and even if there were this is not enough. The government has to show that the building was used in commerce. Describing the persons as "patrons" does not indicate the manner of their patronage. One doesn't know if they were members of a private club, if alcohol was served at the club, if so, if it was obtained through . . . interstate commerce channels, if an alcohol license was obtained by the owner or any of a number of other things that the Government may have proven to show an interstate nexus.

Petitioner's Br. (No. 04-1218) at 24.

---

[10] (...continued)
941, 947-48 (4th Cir. 1996) (holding that Government did not have to establish that defendant intended to damage rental property; it was sufficient that the Government showed that "the defendant acted intentionally or with willful disregard of the likelihood" that damage to the rental property would result from his actions).

We believe that Mr. Soy's evidentiary and legal arguments are meritless. First, with respect to Mr. Soy's contention that the explosion did not damage Edo's Lounge, the record reflects that there was damage to the building, specifically the roof. *See* Tr.V at 1090. Furthermore, in light of our determination that the per se rule of *Russell* extends to restaurants and bars, we also must reject Mr. Soy's alternative claim that the Government failed to meet its burden of proof that the building housing Edo's Lounge was used in interstate commerce.

### b. bombing of Salvino's Restaurant

The same analysis applies with respect to the bombing of Salvino's Restaurant—another one of the overt acts alleged in the conspiracy. Again, the record establishes that there was damage to the building housing Salvino's. *See* Tr.V at 1150. Furthermore, the interstate commerce connection is met by virtue of the fact that Salvino's is a restaurant.

### c. bombings of the apartment units

The interstate commerce nexus also is met with respect to the last two bombings—the bombings of two different apartment complexes. The record establishes that both of these buildings suffered damage as a result of the explosions. *See* Tr.V at 1182 (discussing damage to building at 6151 Harrison); *id.* at 1198-99 (discussing damage to building at 1608 169th Street). Again, the record clearly reflects that the buildings at issue were used as multi-family apartment houses that fall squarely within *Russell*'s per se rule.

Because the record establishes that each of the target buildings was damaged and each of the target buildings, as a matter of law, was used in interstate commerce for pur-

poses of § 844(i), there is no basis on which to disturb Mr. Soy's conviction on Count 1 of the indictment.[11]

## B. Resentencing

In addition to challenging the district court's decision not to disturb Count 1, Mr. Soy also challenges the district court's reimposition of the 528-month sentence. Mr. Soy argues first that the district court's act of resentencing him on the remaining counts—after vacating Count 2—resulted in double jeopardy. According to Mr. Soy, because the dis-

---

[11] The Government also argues that each of the overt acts of the conspiracy charged Mr. Soy not only with damaging real property, but also with damaging the NIPSCO meters servicing those properties. These meters, the Government maintains, are "personal property" used in interstate commerce. Respondent's Br. (No. 04-1218) at 15. For instance, with respect to the bombing of the Antkowicz home, the indictment alleged that the "building *and* other . . . personal property" was damaged. R.1 at 2 (emphasis added). Thus, in order to prove the overt act, it was necessary for the Government to establish that both the dwelling and "other . . . personal property" were damaged, only one of which needed to satisfy the interstate commerce requirement.

There is no question that, after *Jones*, the dwelling did not qualify as being "used in" interstate commerce for purposes of § 844(i). It is possible that, if the Government established that the meter was NIPSCO's personal property and was "used in" interstate commerce, the requirements of *Jones* would have been satisfied. However, the Government has not pointed us to any place in the record that establishes that the property was owned by NIPSCO, nor has it provided authority for the proposition that the meters constituted personal property as opposed to fixtures.

Because we hold that the interstate commerce nexus for the conspiracy count is satisfied by the other overt acts, it is not necessary for us to cull the record or the law to determine if the Government's assertions are correct.

trict court previously had ordered all of the counts to run concurrently with Count 2, and because the longest of those sentences was ten years, Mr. Soy should be released immediately, having served the sentences on all of the remaining counts. Mr. Soy also maintains that the district court should not have cross-referenced the Chapter 2, Part A Guidelines when determining the appropriate sentence for the conspiracy count. Alternatively, Mr. Soy argues that the district court selected the incorrect Chapter 2, Part A guideline; he submits that the district court should have cross-referenced the second degree murder or manslaughter guideline, as opposed to the first degree murder guideline. Finally, although Mr. Soy did not present the argument in his brief, there is a question of whether, and how, the Supreme Court's recent decision in *United States v. Booker*, 125 S. Ct. 738 (2005), affects Mr. Soy's resentencing. We begin our analysis with Mr. Soy's double jeopardy claim.

### 1. Double Jeopardy

Mr. Soy acknowledges "[t]he authority of a trial court to re-sentence a Defendant after vacating an entire sentence even though only a portion thereof has been challenged." Petitioner's Br. (No. 03-3438) at 16. However, Mr. Soy continues, the general rule applies only when the original sentence constituted a sentencing package. Mr. Soy maintains that, in the present situation, there was no interrelationship between the sentence on Count 2 and the sentences on the remaining counts, and, therefore, the district court was not at liberty to resentence him on the remaining counts. The Government counters that Mr. Soy's sentence on Count 2 was part of his entire sentencing package, and, therefore, the district court was entitled to reconsider the entire sentence. We evaluate these arguments below.

### a. sentencing packages

"The theory of double jeopardy is that a person need run the gantlet only once. The gantlet is the risk of the range of punishment which the State or Federal Government imposes for that particular conduct. . . . He risks the maximum permissible punishment when first tried. That risk having been faced once need not be faced again." *North Carolina v. Pearce*, 395 U.S. 711, 727 (1969) (Black, J., concurring).

Traditionally, courts have held that the prohibition of double jeopardy found in the Fifth Amendment, *see* U.S. Const. amend. V,[12] does not tie the hands of a district court on resentencing after one count of a multicount conviction is vacated because the original sentence is considered to be a "sentencing package." We explained in *United States v. Shue*, 825 F.2d 1111 (7th Cir. 1987), that

> [t]he original sentences imposed on all four counts . . . were clearly interdependent; they comprised a sentencing package. When that sentencing package was "unbundled" because of a successful appeal of some, but

---

[12] **The Fifth Amendment to the United States Constitution provides:**

> **No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.**

U.S. Const. amend. V.

> not all, of the counts of the multicount conviction, the double jeopardy clause does not bar resentencing on the affirmed count so long as the new sentence conforms to statutory limits and effectuates the district court's original sentencing intent.

*Id.* at 1115 (citations and footnote omitted). The fact that a prisoner successfully attacks one or more counts of a multicount conviction by way of a § 2255 motion, as opposed to through direct appeal, does not alter the analysis. *United States v. Smith*, 103 F.3d 531, 534 (7th Cir. 1997).

The adoption of the Guidelines, however, caused us to rethink the concept of sentencing packages. We observed that "[i]n the old days of almost unlimited discretion in sentencing, a district judge could follow several paths to a desired result." *Id.* Thus, when a conviction was vacated, all of the considerations that went into the initial sentence had to be reweighed to determine the appropriate result upon resentencing. However, "[u]nder the Guidelines, . . . discretion is far more limited, and the paths are more like catwalks than boardwalks." *Id.* The change in the level of discretion enjoyed by the district court led us to conclude that "[u]nder the guidelines, it is possible in some cases for us to reverse and remand on certain issues and yet not unbundle the package. In other cases, our actions may likely undermine the entire sentencing intent of the district judge. In the latter cases full resentencing is appropriate." *Id.*

We have had several occasions to discuss the concept of "unbundling" and "sentencing packages" with respect to resentencings that occurred in the wake of the Supreme Court's decision in *Bailey v. United States*, 516 U.S. 137 (1995). *Bailey* narrowed the circumstances under which weapons are considered to be "used in" drug trafficking crimes for purposes of 18 U.S.C. § 924(c). Following *Bailey*,

many § 924(c) convictions were vacated, and we were faced with the question of how the vacated § 924(c) conviction impacted the sentence that originally had been imposed by the district court. We explained:

> [I]n most cases involving the mandatory consecutive 5-year § 924(c) sentence, vacating that portion of the sentence radically changes the sentencing package. If a mandatory sentence for using or carrying a gun is imposed, the otherwise available enhancement for possession of a firearm is not invoked. But if the mandatory sentence is set aside, nothing should prevent the imposition of the enhancement. In that sense, the idea of the "sentencing package" remains a perfectly viable concept.

*Smith*, 103 F.3d at 534-35. In other cases, we have characterized the district court's sentencing for a § 924(c) violation as an "either/or" proposition—a necessary choice between the mandatory 5-year sentence and the offense enhancement under § 2D1.1(b)(1). *United States v. Binford*, 108 F.3d 723, 729 (7th Cir. 1997). Thus, because the imposition of the § 924(c) sentence required a district court to forego an otherwise applicable weapons enhancement under the Guidelines, the sentence for the § 924(c) conviction could not be considered independent of the sentences on the other convictions. Consequently, after vacating a § 924(c) conviction pursuant to *Bailey*, a district court could reconsider the defendant's entire sentence without subjecting the defendant to double jeopardy.

### b. application

We believe that the same rationale applies to the present situation and allows the district court to unbundle the sentencing package. At Mr. Soy's last resentencing prior to

Count 2 being vacated, the district court sentenced Mr. Soy to 528 months' imprisonment on Count 2, a term of 60 months on Count 1 and terms of 120 months on the remaining counts, with all the sentences to run concurrently. *See* Tr.XII at 20. The court explained its sentence accordingly:

> This case is on remand for resentencing with an order that the court should state reasons for the sentence in more detail and indicate why the sentence is not a life sentence, and also allow the court to adjust the sentence to make sure that life expectancy of each defendant is properly considered.
>
> The court feels that it was affirmed on all other aspects of the trial and sentencing, and therefore will not comment or retrace those steps. . . .
>
>     . . . .
>
> The court has selected a sentence today taking into account the defendant's life expectancy. The court has also considered the nature, extent and gravity of the crime that although not premeditated, involved a very high degree of recklessness and warranted punishment between the level that would be employed for a premeditated murder and that would be employed for a murder committed recklessly, but not in the aggravated manner exhibited here.
>
> This court finds this defendant's criminal acts and behavior which resulted in the death of an innocent bystander to be reckless and to merit a severe sentence. In fashioning a sentence for this defendant, the court is imposing a sentence significantly, though not necessarily greatly less, than a sentence of life imprisonment.
>
>     . . . .

In this particular case, the sentence is approximately 10 to 15 percent below the life expectancy, which, given the nature and gravity of the crime, is a fair sentence for this defendant; and will also provide a deterrent effect for others considering this type of action in the future.

Tr.XII at 23-26. The statements of the district court make it clear that the district court believed that a sentence of 528 months was appropriate for the crimes that Mr. Soy committed and was necessary in light of the disregard for human life that Mr. Soy displayed during the course of his criminal activity. The district court's focus on the conviction for Count 2 was consonant with the method for calculating the sentence set forth by the then-mandatory Guidelines.[13] The Guidelines instructed the district court to sentence a defendant to concurrent sentences on a multiple-count conviction "[i]f the sentence imposed on the count carrying the highest statutory maximum is adequate to achieve the total punishment." U.S.S.G. § 5G1.2(c) (1995). Thus, after determining that 528 months was appropriate on Count 2, the court had no discretion with respect to the treatment of the remainder of the sentences.

This is similar to the type of scenario described in *Smith*. Just as the imposition of consecutive sentences pursuant to § 924(c) precluded the district court from applying the firearm enhancement under the Guidelines, a determination that the sentence on Count 2 achieved the total punishment[14] precluded the district court from running consecutively the

---

[13] **The impact of the Supreme Court's decision in *United States v. Booker*, 125 S. Ct. 738 (2005), rendering the Guidelines advisory, is discussed later in this opinion.**

[14] **Indeed, the district court could not have imposed a much greater sentence without running afoul of our instructions in *United States v. Prevatte*, 16 F.3d 767 (7th Cir. 1994), and *United States v. Prevatte*, 66 F.3d 840 (7th Cir. 1995).**

sentences on the remaining counts. Thus, the sentences imposed on the conspiracy and substantive counts back in 1996 were not independent of one another, but were only given effect through the lengthier sentence imposed for Count 2; the 528-month sentence on all of the counts constituted a sentencing package. Because the sentences were interdependent, the district court, upon vacating Count 2, was at liberty to resentence Mr. Soy on the remaining counts without running afoul of the Fifth Amendment's prohibition of double jeopardy.[15]

---

[15] Mr. Soy also makes a cursory argument that resentencing him to the same term of imprisonment violated his right to due process of law. He cites *North Carolina v. Pearce*, 395 U.S. 711 (1969), in support of his contention. In *Pearce*, the Court held that the imposition of a higher sentence after a successful collateral attack raises a presumption of vindictiveness and of a due process violation. This holding of *Pearce* has been narrowed by *Alabama v. Smith*, 490 U.S. 794, 795 (1989). However, even if *Pearce* retained its full force, no presumption arises under the circumstances presented here. Our court follows the "'aggregate package' approach when analyzing *Pearce* claims." *See United States v. Rivera*, 327 F.3d 612, 615 (7th Cir. 2003). "Under this approach, . . . we compare the *total* original punishment to the *total* punishment after resentencing in determining whether the new sentence is more severe." *Id.* (emphasis in original). In this case, Mr. Soy's original punishment and the punishment after resentencing are identical.

In the absence of a presumption, the defendant bears the burden of coming forward with evidence of actual vindictiveness on the part of the sentencing court. *See id.* Mr. Soy has made no effort to come forward with such evidence, and, consequently, we conclude that Mr. Soy has failed to show a due process violation with respect to his last resentencing.

### 2. Relevant Conduct

Having determined that the district court did not subject Mr. Soy to double jeopardy upon resentencing, we turn next to Mr. Soy's claim that the district court miscalculated his sentence. Before we consider Mr. Soy's argument, we first review in detail the method by which the district court arrived at Mr. Soy's sentence of 528 months' imprisonment.

### a. sentencing calculation

The starting point for the district court's calculation of Mr. Soy's sentence was the guideline for conspiracy, U.S.S.G. § 2X1.1. Section 2X1.1(a) references the base offense level from the guideline for the object offense, here a violation of § 844(i).

The guideline for a § 844(i) violation—arson and property damage by means of an explosive—is § 2K1.4. Section 2K1.4 provides for a base offense level of either 24 or 20. However, subsection (c) of 2K1.4 contains a cross-reference: "If death resulted, or the offense was intended to cause death or serious bodily injury, apply the most analogous guideline from Chapter Two, Part A (Offenses Against the Person) if the resulting offense level is greater than that determined above." U.S.S.G. § 2K1.4.

At this point in the analysis, the district court faced the question of whether the death of Emily Antkowicz was a result of the conspiracy. To make this determination, the court looked to the relevant conduct guideline, § 1B1.3. According to § 1B1.3,

> [u]nless otherwise specified, . . . cross-references in Chapter Two . . . shall be determined on the basis of the following:
>
> (1) (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

(B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense; . . . .

U.S.S.G. § 1B1.3(a). The district court determined that

[the] bombing[,] . . . which resulted in Emily Antkowicz's death, was performed as a test in preparation for subsequent bombings in furtherance of the conspiracy. The bombing at issue was tantamount to arson. Consequently, this Court finds the bombing which resulted in Emily Antkowicz's death was performed in furtherance of the conspiracy charged in Count I of the indictment.

Tr.XIV at 69.

The district court then returned to the instructions provided in the cross-reference of § 2K1.4(c)—to apply "the most analogous guideline from Chapter 2, Part A (Offenses Against the Person)." The court found that

the placing of an active bomb at or near the proximity of where people live was extremely reckless behavior. This Court finds Emily Antkowicz's death was a foreseeable consequence of the conspiracy. Consequently, the 2K1.4C1 [sic] cross-reference should be applied as relevant conduct.

As this Court's application of 2K1.4C1 [sic] has been affirmed by the Seventh Circuit on a prior appeal of this case, the Court finds the cross-reference to be appropriate in this instance.

*Id.* at 69-70. Applying the first degree murder cross-reference resulted in an offense level of 43, which corresponded to a life sentence.

However, the district court not only was constrained by this court's prior two decisions (in which we vacated the life sentence and remanded for consideration of life expectancy, respectively), it also was constrained by the Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466 (2000).[16] Thus, the court could not, consistent with *Apprendi*, sentence Mr. Soy to anything beyond the five-year statutory maximum provided for conspiracy violations.[17] Thus, in order to effectuate the total punishment for Mr. Soy, the district court stacked the counts according to U.S.S.G. § 5G1.2(d),[18] which states that "[i]f the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment." The district court then ordered the following sentence for Mr. Soy:

Pursuant to the sentencing reform act of 1984, it is the judgment of the Court that the defendant, Robert Soy,

---

[16] *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."

[17] The district court also was constrained by the statutory maximum of ten years on the substantive offenses.

[18] *See supra* p.12 and note 5.

> is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 60 months on Count 1 and a term of 120 months on each of Counts 6, 7, 8, 10, 11, 12, 14, 16, 18, 19 and 20, to be served consecutively to the extent necessary to produce a total term of 528 months.

Tr.XIV at 76.

### b. evaluation of the sentencing calculation

Mr. Soy makes three arguments with respect to the district court's calculation of his sentence. First, he argues that the district court erred when it applied the cross-reference to Chapter 2, Part A found in § 2K1.2(c). Second, Mr. Soy maintains that, given the requirements for relevant conduct set forth in § 1B1.3, the death of Emily Antkowicz does not qualify as relevant conduct to the conspiracy. Finally, Mr. Soy contends that the district court did not choose the most analogous guideline from Chapter 2, Part A; the court should have applied the second degree murder or the manslaughter guideline, not the guideline for first degree murder. We consider these arguments below.

### (i) cross-reference to Chapter 2, Part A

Mr. Soy argues first that the district court should not have applied § 2K1.2(c)'s cross-reference to Chapter 2, Part A. According to Mr. Soy, the starting point for the sentence calculation begins with § 2X1.1(a),[19] which instructs the sentencing court to use "[t]he base offense level from the

---

[19] **This was, in fact, the starting point for the district court's analysis.**

guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." Mr. Soy agrees with the district court that the guideline for the substantive offense is § 2K1.1. However, Mr. Soy submits that the second phrase of the conspiracy guideline—"plus any adjustments from such guideline for any *intended* offense conduct"—precludes the court from applying the cross-reference of § 2K1.1(c). U.S.S.G. § 2X1.1(a) (emphasis added). According to Mr. Soy, the death of Emily Antkowicz was not "intended," and, therefore, the district court was limited to applying one of the "base offense levels" designated in the arson statute, 24 or 20.

We believe that Mr. Soy reads the "intended" language too broadly. The commentary to § 2X1.1 explains that

> "[s]ubstantive offense," as used in this guideline, means the offense that the defendant was convicted of soliciting, attempting or conspiring to commit. Under § 2X1.1(a), the base offense level will be the same as that for the substantive offense. But the only specific offense characteristics from the guideline for the substantive offense that apply are those that are determined to have been specifically intended or *actually occurred. Speculative* specific offense characteristics will not be applied.

U.S.S.G. § 2X1.1, cmt. 2 (emphasis added). The commentary therefore makes clear that the limitation set forth in § 2X1.1 is not designed to prevent a defendant from being held accountable for actions that *actually occurred* during the course of the conspiracy. The limitation is directed to actions that may have been intended, but *were not consummated*, in the course of the conspiracy or attempt. If the conspiracy or attempt included actions that were intended, but had not occurred, then the district court could "adjust" the offense levels for those actions only if the criminal design could "be established with reasonable certainty." U.S.S.G. § 2X1.1(a).

Here, there is no question that the conspiracy, of which Mr. Soy was a member, was the detonation of explosives. The death of Emily Antkowicz both *actually occurred* and occurred as a result of the bombing conspiracy. Consequently, according to the commentary for § 2X1.1, the limitation invoked by Mr. Soy does not apply to the death of Emily Antkowicz.

### (ii) death of Emily Antkowicz as relevant conduct

As noted above, Mr. Soy contends that the death of Antkowicz was not "relevant conduct" with respect to the conspiracy charged in Count 1. Mr. Soy relies on *United States v. Ritsema*, 31 F.3d 559 (7th Cir. 1994), and *United States v. Ojomo*, 332 F.3d 485 (7th Cir. 2003), in support of his argument.[20]

*Ritsema* involved a defendant who had sexually abused a neighbor girl on several occasions. On one of those occasions, Ritsema showed the victim a rifle with a silencer attached and threatened that, if the victim told anyone

---

[20] Although Mr. Soy discusses both *United States v. Ritsema*, 31 F.3d 559 (7th Cir. 1994), and *United States v. Ojomo*, 332 F.3d 485 (7th Cir. 2003), at length, there is little argument presented with respect to how *Ritsema* and *Ojomo* apply to Mr. Soy's situation. Mr. Soy merely states:

> Pursuant to *Ritsema*, the conduct did not occur during the charge offense. Under the express wording of Subsection (a)(2) the 844(i) charges do not require grouping. Therefore, all acts set forth in Subsections 1(a) and 1(b) are inapplicable. Finally, because both Subsections 1(a)(1) and 1(a)(2) are inapplicable, 1(a)(3) is likewise inapplicable. For these reasons, the trial court's order imposing a 528 month prison term must be reversed.

Petitioner's Br. (No. 03-3438) at 16.

about the abuse, "people w[ould] get hurt." *Ritsema*, 31 F.3d at 563. A later search of Ritsema's residence yielded the rifle and several silencers. Ritsema pleaded guilty to possession of the silencers and was sentenced to 120 months' imprisonment. The sentence included an enhancement for obstruction of justice "because Ritsema had tried to avoid detection of his misdeeds by using a rifle to threaten K.J.L. into keeping quiet." *Id.* at 564. Ritsema appealed his sentence. This court stated:

> Section 1B1.3(a)(2) cannot be read to make Ritsema's obstruction of justice conduct relevant to his silencer offense because by its terms, it applies *only* to offenses which would be grouped as multiple counts under section 3D1.2(d). Section 3D1.2(d) neither lists offenses under 2K2.1 (Firearms) nor those under 2J1.2 (Obstruction of Justice) as the kind of offenses that are required to be grouped together.
>
> . . . .
>
> Likewise, subsection (a)(3) of 1B1.3 does not operate to make Ritsema's obstruction behavior relevant conduct either. The threats to K.J.L. were not a "harm that resulted" from the possession of the unregistered silencer, nor were they a "harm that was the object" of the possession. As we noted earlier, Ritsema did not and could not plausibly have carried out his threats against K.J.L. with the silencers alone. He was able to intimidate K.J.L. because of the rifle, to which the silencer was attached. Possession of the silencer itself resulted in no harm to K.J.L.
>
> If Ritsema's obstruction conduct is to be deemed conduct relevant to the silencer possession under section 1B1.3, then, it must fall under subsection (a)(1). That subsection presents four discrete conditions under

which Ritsema's obstruction conduct may be deemed relevant. Subsection (a)(1) includes all acts or omissions by the defendant that (1) occurred during the commission of the charge-offense, (2) was in preparation for committing it, (3) was done in an attempt to hide the offense, or (4) was otherwise done in furtherance of it.

The threats to K.J.L. were not in any way done in preparation for the silencer possession, or to avoid detection of it, nor were they done "in furtherance" of the silencer possession. Therefore, Ritsema's obstruction conduct does not fall under conditions (2), (3), or (4) above.

*Id.* at 565-66 (emphasis in original).

Mr. Soy concludes from *Ritsema* that, because his crimes could not be grouped together under § 3D1.2, they cannot be related conduct for purposes of § 1B1.3. However, it is clear from the text of § 1B1.3, as well as the explanation of § 1B1.3 in *Ritsema*, that grouped conduct (pursuant to § 3D1.2) is only one, nonexclusive means of determining whether conduct is relevant to the charged offense. *See* U.S.S.G. § 1B1.3(a)(2). Conduct also may be "relevant" because it meets the requirements set forth in § 1B1.3(a)(1), (a)(2) or (a)(4).

Here, the death of Emily Antkowicz qualifies as related conduct pursuant to § 1B1.3(a)(1)(B) because it is an act in furtherance of jointly undertaken criminal activity "that occurred . . . in preparation for that offense."[21] The bomb

---

[21] **Mr. Soy does not deny that the bomb that killed Emily Antkowicz was detonated in preparation for carrying out the scheme of diversionary bombings. Mr. Soy merely states "under the express wording of Subsection(a)(2) the 844(i) charges do not**
                                                        **(continued...)**

detonated at 1425 Stanton was jointly undertaken criminal activity. Furthermore, the purpose of detonating that bomb was to gauge the response time of emergency personnel in preparation for the scheme of diversionary bombings. The bombing, therefore, was "in preparation" for the series for bombings.

Mr. Soy also relies upon *Ojomo*. In *Ojomo*, we considered whether the defendant could be held accountable for "uncharged, unproven 'related conduct' at sentencing." 332 F.3d at 489. In that case, we determined that the district court did not err in holding the defendant responsible because it was clear that the " 'unconvicted activities bore the necessary relation to the convicted offense.' " *Id.* (quoting *United States v. Smith*, 218 F.3d 777, 783 (7th Cir. 2000)).

We fail to see how *Ojomo* assists Mr. Soy. Mr. Soy was not held responsible for uncharged, unproven conduct that was related in some tangential way to the conspiracy for which he was convicted. Rather he was charged with, and convicted of, the § 844(i) violation that resulted in the death of Emily Antkowicz. The conviction later was vacated, not because there was insufficient evidence to establish that Mr. Soy was involved in the bombing or that the bombing did not cause the death of Emily Antkowicz, but only because the requisite nexus to interstate commerce was missing. Thus, *Ojomo* does not speak to the situation before us.

For these reasons, we do not believe that the district court erred in determining that the death of Emily Antkowicz constituted conduct relevant to the charged conspiracy.

---

**[21] (...continued)**
**require grouping. Therefore, all acts set forth in Subsections 1(a) and 1(b) are inapplicable. Finally, because both Subsections 1(a)(1) and 1(a)(2) are inapplicable, 1(a)(3) is likewise inapplicable."**
**Petitioner's Br. (No. 03-3438) at 16.**

### (iii) propriety of the first degree murder reference

Mr. Soy maintains that, even if the death of Emily Antkowicz constitutes relevant conduct, the district court erred nonetheless in cross-referencing the first degree murder guideline as opposed to one of the other guidelines in Chapter 2, Part A of the Guidelines. We disagree.

This court twice has considered Mr. Soy's contention that the first degree murder guideline is inapplicable to the death of Emily Antkowicz. In *Prevatte I*, we held that § 2A1.1 is the most analogous guideline when death results from a violation of § 844(i), regardless of whether the death occurred as a result of fire or as a result of an explosion. 16 F.3d at 782. However, because the district court had not considered the possibility of a departure based on the defendant's state of mind as directed by the application note to § 2A1.1, we remanded the case to the district court for resentencing.

The district court resentenced Mr. Soy to 636 months' imprisonment on Count 2, to run concurrently with the sentences on the remainder of the counts. The sentence represented a slight departure based on Mr. Soy's state of mind—extreme recklessness. Mr. Soy again sought review in this court and argued, inter alia, that, in light of the district court's determination that the death of Emily Antkowicz was the result of Mr. Soy's recklessness, the district court was obligated to cross-reference the guideline for second degree murder as opposed to that for first degree murder. Again we rejected this argument. We observed that our mandate was to "consider whether, on the facts of this case, a downward departure was warranted. The district court complied with our mandate when it considered the possibility of a lower sentence." *Prevatte II*, 66 F.3d at 844. We also did not believe that the application note "cabin[ed]

the discretion of the district court" to the degree suggested by Mr. Soy. *Id.* We explained that

> [t]he application note quite explicitly suggests that a departure below that prescribed for second degree murder or for the underlying offense is not likely to be appropriate. This notation is hardly a directive to the district court that any departure must, as a matter of law, reduce the sentence to the level of second degree murder. To hold that a departure must correspond to the base offense level stipulated in § 2A1.2, Second Degree Murder, every time the court finds that a defendant's mental state was less than "intentionally or knowingly," *cf.* U.S.S.G. § 2A1.1, comment. (n.1), would negate the congressional determination that death resulting from certain felonies, such as arson, should be punished not as second degree murder, but as first degree murder. . . . This analysis can be read as a determination by the district court that the defendants engaged in conduct that, although not premeditated, involved a high degree of recklessness and warranted punishment between the level that would be employed for premeditated murder and the level that would be employed for a murder committed recklessly but not in the aggravated manner exhibited here. Such a determination is clearly permissible under the congressional determination concerning the punishment of murder committed in the course of arson. The sentence corresponds to an offense level of 42, which provides that an individual be sentenced to "360 [months]-life."

*Id.* at 844-45 (footnote omitted).[22]

---

[22] As noted above, in *Prevatte II* we remanded for resentencing for the district court to consider the impact of *United States v.*
(continued...)

Mr. Soy now argues that because his conviction on Count 2—the substantive arson count resulting in the death of Emily Antkowicz—has been vacated, the district court's cross-reference to the first degree murder guideline, and our prior approval of the use of that guideline, is no longer applicable. Again, we disagree. Although Count 2 has been vacated, we have set forth above how the death of Emily Antkowicz constitutes relevant conduct for purposes of the conspiracy count. The conspiracy guideline cross-references the guideline for the underlying substantive offense (arson), which, in turn, cross-references Chapter 2 of the Guidelines. The death of Emily Antkowicz occurred as the result of the commission of another felony—the conspiracy to commit arson. As explained in *Prevatte I*, the application of the first degree murder guideline, based on the analogy to the felony-murder rule, is appropriate. Furthermore, as set forth in *Prevatte II*, the district court's finding that the defendant's state of mind was extreme recklessness does not require the court to cross-reference the second degree murder guideline. Thus, the district court did not err in cross-referencing the first degree murder guideline.

### 3. *Booker* Considerations

After the briefs had been submitted in this case, Mr. Soy submitted *Blakely v. Washington*, 124 S. Ct. 2531 (2004), and

---

[22] (...continued)
*Martin*, 63 F.3d 1422 (7th Cir. 1995), which required the district court to consider the defendant's life expectancy when sentencing a defendant to a term of years to ensure that the term of years was not tantamount to a life sentence. *See Prevatte II*, 66 F.3d at 844-45.

later *United States v. Booker*, 125 S. Ct. 738 (2005), as supplemental authority. *Booker*, of course, held that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." *Booker*, 125 S. Ct. at 756.

We believe that *Booker*'s application to Mr. Soy's sentence is tangential at best. Although it is true that the death of Emily Antkowicz affected the district court's sentence—in that, to effect the total punishment, the district court ran the remaining counts consecutively—the death of Emily Antkowicz was not a fact found solely by the district court. A jury convicted Mr. Soy of using an explosive that caused the death of Emily Antkowicz; the vacation of that conviction on interstate commerce grounds did not undermine the jury's determination that Mr. Soy's actions in setting off the bomb at 1425 Stanton caused Emily Antkowicz's death. Thus, because there was a jury finding that Mr. Soy's actions resulted in the death of Emily Antkowicz, the district court's reliance on this fact in sentencing Mr. Soy did not offend the Sixth Amendment.

However, we have determined that, even in the absence of a Sixth Amendment violation, the "mere mandatory application of the Guidelines—the district court's belief that it was required to impose a Guidelines sentence—constitutes error." *United States v. White*, No. 03-2874, slip op. at 14 (7th Cir. May 3, 2005). Again, however, we believe that, under these circumstances, the Guidelines had little or no limiting effect on the district court when it resentenced Mr. Soy.

The district court initially sentenced Mr. Soy to life imprisonment, a sentence that later was vacated. However, it was our holding in *Prevatte I* as to the applicability of 18 U.S.C. § 34—not any provision of the Guidelines—that

confined the district court to sentence Mr. Soy to a term of years as opposed to life imprisonment. The district court then resentenced Mr. Soy to 636 months' imprisonment; again, it was our mandate in *Prevatte II*, which did not implicate the Guidelines, that caused the district court upon remand to resentence Mr. Soy to 528 months' imprisonment.

After vacation of Count 2, the district court again sentenced Mr. Soy to 528 months' imprisonment. In doing so, the court employed consecutive sentences—as required by the Guidelines—in order to effectuate the total punishment. Thus, the only direct effect that the Guidelines have had on Mr. Soy's most recent sentence is to allow the district court to impose a longer punishment through consecutive sentences pursuant to U.S.S.G. § 5G1.2(c).

Given this history, we have little confidence that, freed from the mandates of the Guidelines, the district court would impose a lesser sentence on Mr. Soy. Nevertheless, consistent with our holding in *United States v. Paladino*, 401 F.3d 471 (7th Cir. 2005), and in *White*, we shall allow the district court to make this determination.

## Conclusion

For the foregoing reasons, the judgment of the district court is affirmed. However, while retaining jurisdiction, we remand the matter to the district court for proceedings consistent with *Paladino*.

IT IS SO ORDERED

A true Copy:

     Teste:

                _____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*