UNPUBLISHED ORDER
Not to be cited per Circuit Rule 53

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois  60604**

Argued July 12, 2006
Decided October 16, 2006

**Before**

Hon. JOHN L. COFFEY, *Circuit Judge*

Hon. KENNETH F. RIPPLE, *Circuit Judge*

Hon. DIANE S. SYKES, *Circuit Judge*

No. 05-2158

|  |  |
|---|---|
| UNITED STATES OF AMERICA, <br> *Plaintiff-Appellee*, | Appeal from the United States District Court for the Eastern District of Wisconsin. |
| v. | No. 04 CR 38 |
| HOWARD D. PHILLIPS, <br> *Defendant-Appellant*. | Rudolph T. Randa, <br> *Chief Judge*. |

## O R D E R

Howard Phillips was convicted of one count of armed bank robbery and two counts of attempted bank robbery, 18 U.S.C. § 2113(a), (d), and sentenced to concurrent terms of imprisonment totaling 300 months.  He decided not to testify during trial because he wanted to avoid being impeached with his extensive criminal history, including a prior conviction for bank robbery.  Now he argues that the district court should have declared a mistrial because a government witness (his father) and the prosecutor during closing argument alluded to his criminal history. Because these references did not render the trial unfair, we affirm.

## BACKGROUND

Phillips and his codefendant, Kelvin Crayton, engaged in a series of bank robberies and attempted bank robberies using fake bombs made from a cardboard box and also using a toy gun. Crayton pleaded guilty and testified against Phillips; that testimony was corroborated by circumstantial evidence. Our recitation of the evidence begins with Crayton's trial testimony.

Phillips was acquitted of involvement in the first robbery that Crayton attributed to their partnership: a holdup of a Wells Fargo Bank in Milwaukee on January 8, 2004. According to Crayton's testimony, the two made an ersatz bomb out of a box, duct tape, and firecrackers they obtained at Phillips's aunt's house. Phillips drove the getaway car (his aunt's) while Crayton walked into the bank, threatened the teller with the fake bomb, and stole $6,000. Crayton testified that the two split the money; Phillips bought clothes and a cell phone with his portion. (Indeed, a cell phone call log beginning just after the robbery that day suggests that Phillips bought a cell phone with his part of the spoils.)

Although acquitted in this first robbery, Phillips was convicted of attempted robbery for his part in a failed heist of the same bank a week later, on January 15. Having constructed another mock bomb at Phillips's aunt's house, Crayton approached a teller at the Wells Fargo Bank and produced a threatening demand note; Phillips waited in the getaway car. This time Crayton did not actually display the counterfeit explosive, and the teller refused to give him any money.

Phillips was convicted of a second attempted robbery in connection with events at another bank later that same day. The two men drove to a North Shore Bank in Milwaukee on the afternoon of January 15 but hesitated when they spotted two police officers eating at a restaurant across the street. They bided their time by driving around, returning later to survey the area to confirm the police had departed. Crayton then went into the bank and demanded money with a threatening note, but the teller demurred and called her manager. Crayton came away empty-handed.

Finally, Phillips was convicted of a completed robbery of an M&I Bank in suburban Milwaukee on January 16. In this holdup the robbers changed their methods and carried out the crime with a toy gun rather than a fake bomb. On the day of the crime the two men went to a Walgreens to buy the toy gun but could not find one suitably realistic; nonetheless, Phillips did buy a hat and gloves that Crayton would later wear during the robbery. They then went to a Wal-Mart but again found no acceptably realistic toy gun. Ultimately, at a second Walgreens, they purchased a cap gun. Because it too was rather unpersuasive, they also bought duct tape to wrap around it to make it more convincing. Now prepared, they went to the M&I Bank; Crayton went inside, put the toy gun on the counter (partially concealed in the hat that Phillips purchased), and displayed a demand

note. The teller gave him $3,000. While leaving the bank, Crayton was chased by a customer. Crayton ran to the car, pushed Phillips from the driver's seat, and took over driving. They successfully evaded police in an ensuing car chase and eventually crashed the car. They ran away from the wreck, and Phillips called his aunt to tell her to report to police that her car was stolen.

As we have noted, the government adduced evidence to corroborate Crayton's testimony. First was evidence that the men were together all day on January 15, the day of the two attempted robberies. Crayton's mother testified that the two men visited the school where she taught, both before the first attempt and after the second. They made the visits so Crayton could ask his mother for money, and she went with both men after the second attempt to her own bank, where all three were videotaped. Additionally, Crayton testified that he had accompanied Phillips that morning to a meeting; although Crayton did not say so, the meeting happened to be with Phillips's probation officer. The probation officer, without identifying himself as such, confirmed the meeting.

Second was circumstantial evidence putting the men together at the North Shore Bank around the time of the attempted robbery there. A customer of the North Shore Bank testified that he saw them together in front of the bank, where Phillips smoked a cigarette. A cigarette butt was found outside the bank with Phillips's DNA on it.

Third, additional evidence showed Phillips and Crayton preparing for (and escaping from) the completed robbery of M&I Bank. Videotape from both Walgreens stores showed Phillips and Crayton together buying the hat and gloves and shopping for a toy gun. A receipt for the purchase of the hat and gloves, recording the correct time, was found near the wreck of the getaway car. Videotape from Wal-Mart showed the two shopping for a toy gun. Videotape from the second Walgreens showed a purchaser buying a toy gun and duct tape; the purchaser is seen wearing a watch resembling one owned by Phillips. Phillips's fingerprints were on the toy gun's package, recovered near the wrecked getaway car. Telephone records showed a call from Phillips's phone to Phillips's aunt when she was asked to report the car stolen. The aunt gave a written statement to police that Phillips made the call but testified at trial that it was Crayton. She also testified that she owned the car and that Phillips had access to it. The customer who chased Crayton saw two men in the car, and a witness saw two men flee the scene of the wreck.

Phillips's trial strategy was simply to put the government to its proof. As he told the district court, he decided not to testify because he did not want the prosecutor to impeach his testimony with his prior conviction for bank robbery or to reveal other convictions in his extensive criminal history. Also, he tried to impeach Crayton's testimony by eliciting Crayton's admissions that he testified in order to

get a lesser sentence, that he lied to the police and changed his story about where they went after the robberies, and that he lied about who placed the call to Phillips's aunt. Crayton further admitted on cross-examination that he lied to his mother to get money on the day of the attempted robberies and that he had a criminal history, including a prior conviction for lying to an agent of the government.

Despite Phillips's attempt to conceal his criminal history from the jury, two accidental disclosures occurred. The first took place when the prosecutor asked Phillips's father if he knew whether Crayton was his son's friend. The father said he did not know because, "He's been in jail so long." Phillips's attorney objected. The court instructed the jury to ignore the reference:

> [R]elative to the objection that any mention of jail—you are to disregard that entirely, ladies and gentlemen of the jury, and not to draw any references as to what the witness meant by who. Who that is attached to. That statement. But in any event, you are to disregard it entirely.

After the judge gave this instruction, Phillips's lawyer suggested the father was referring to Phillips's time in custody awaiting trial on the present charges. He did so by eliciting testimony from the father that Phillips had been in jail for six months, during which time father and son never spoke. Counsel then sought a mistrial, but the district court denied the motion because it had given a curative instruction and the prejudicial information was before the jury for just a short time.

The next slip was by the prosecutor during closing arguments. To keep the fact of Phillips's prior convictions from the jury, the parties had agreed to refer to the meeting that Phillips had in the probation office on January 15 generically as a meeting in a federal building. Yet the prosecutor inadvertently said Phillips went to a probation office. Phillips's attorney objected, and the prosecutor quickly explained that the statement was a mistake and that she had meant to say an "employment office." (The jury never learned it, but the meeting with the probation officer was related to Phillips's prior bank robbery conviction.)

Phillips unsuccessfully moved for a mistrial a second time. The jury then acquitted him of any involvement in the January 8 crime and found him guilty on all other counts. The district court denied Phillips's third motion for a mistrial, concluding that the prosecutor's retraction of her own comment had diminished any prejudice and, furthermore, that acquittal on the first robbery demonstrated there had been no prejudice. The court sentenced Phillips to concurrent terms totaling 300 months' imprisonment, five years' supervised release, and $2,706 in restitution.

**DISCUSSION**

Phillips contends on appeal that the district court abused its discretion by rejecting his motions for a mistrial. He argues the government's mention of his meeting at the probation office was improper and resulted in an unfair trial. Moreover, he asserts that the earlier reference by his father to time in jail exacerbated the unfairness caused by prosecutorial misconduct during closing argument. (He does not try to make separate claims based on each incident.)

In making a claim of prosecutorial misconduct, a defendant must demonstrate first that the prosecutor's conduct was improper and second that it prejudiced him to such extent that he was denied a fair trial. *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *United States v. Morgan*, 113 F.3d 85, 89 (7th Cir. 1997). The court's refusal to declare a mistrial on this basis is reviewed for abuse of discretion. *United States v. Jones*, 188 F.3d 773, 778 (7th Cir. 1999).

On the first prong, the government concedes that the prosecutor's comment at closing was improper, and this concession is appropriate. Improper prosecutorial conduct is not easily defined, but it includes violating a court's instruction or breaching a promise to the defense. *See United States v. Hale*, 448 F.3d 971, 986-87 (7th Cir. 2006) (per curiam); *United States v. McGee*, 408 F.3d 966, 984 (7th Cir. 2005). Given the parties' stipulation to obscure the nature of Phillips's meeting in order to exclude evidence of his prior criminal history, the statement was improper. This conclusion stands even though the remark was unintentional; even an inadvertent error can render a trial unfair. *See Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.").

That leaves the second prong, whether the misconduct resulted in an unfair trial. We consider five factors in the evaluation of prejudice. *See Darden*, 477 U.S. at 182; *United States v. Anderson*, 450 F.3d 294, 300 (7th Cir. 2006); *United States v. Washington*, 417 F.3d 780, 786 (7th Cir. 2005). First is "the nature and seriousness of the misconduct" at issue. *Anderson*, 450 F.3d at 300. This factor is sometimes bifurcated into whether the prosecutor misstated evidence or infringed specific rights like the right to remain silent. *See Washington*, 417 F.3d at 786. The second factor is whether the defense invited the objectionable conduct. The third factor requires consideration of opportunities that the defense had to rebut the prosecutor's misstatements. Fourth, we consider whether the trial court remedied the harm with a cautionary instruction. Fifth, the misconduct is evaluated in light of the weight of evidence against the defendant. *Anderson*, 450 F.3d at 300.

Beginning with the nature of the misconduct, Phillips does not (and could not) argue that the prosecutor's statement during closing argument infringed a free-

standing constitutional right; instead, he contends the prosecutor's reference to his meeting at the "probation office" was tantamount to a misstatement of the evidence. He argues that revealing information about his criminal history was not only contrary to the law of evidence but could poison the jurors' opinions against him. The conduct was especially harmful, he argues, when combined with the revelation by Phillips's father that he had been in jail.

The government counters that the misconduct was not as serious as Phillips claims. It was immediately corrected when the prosecutor herself informed the jury that she meant an "employment office," not a "probation office." As for the statement by Phillips's father, that was spontaneous and was minimized by the district court's instruction that the jury disregard it, and also by Phillips's lawyer's suggestion that the reference was to jail time Phillips spent awaiting trial on the instant charges.

On balance, the government has the better argument. First, the prosecutor's quick explanation that she meant to say "employment office" diminishes the misconduct's seriousness. *See, e.g.*, *United States v. Danford*, 435 F.3d 682, 686-87 (7th Cir. 2006) (prosecutor's revelation of prejudicial material to jury for only a short time before its retraction did not require new trial); *United States v. Love*, 336 F.3d 643, 648 (7th Cir. 2003) (isolated comment by prosecutor that was immediately withdrawn would not warrant reversal). Second, the statement was oblique; the prosecutor did not reveal, for example, that Phillips had been on probation *for bank robbery*. A vague statement like the one at issue here is far less prejudicial than one that explicitly refers to a defendant's criminal history. *See United States v. Koen*, 982 F.2d 1101, 1117 (7th Cir. 1992). Third, the misconduct was inadvertent, *see United States v. Hernandez*, 865 F.2d 925, 928 (7th Cir. 1989), and not made to inflame the jury, *see United States v. Ward*, 211 F.3d 356, 365 (7th Cir. 2000), both of which render it less serious. Finally, the statement was not made for the impermissible purpose of establishing bad character, *cf.* FED. R. EVID. 404(b); *Hale*, 448 F.3d at 987-88, but instead to remind the jury of evidence placing the two men together on the morning of the robbery attempts. For all these reasons, even when coupled with the disclosure by Phillips's father, the misconduct was not very serious. (The father's testimony was itself oblique and mitigated by a quick instruction. *See Danford*, 435 F.3d at 686-87.)

With respect to the second factor, Phillips is correct that the defense did not invite the misconduct. After all, Phillips decided not to testify precisely because he wanted to keep this evidence away from the jury. Thus, this factor weighs in his favor.

On the third and fourth factors, Phillips maintains that the court did not instruct the jury to disregard the prosecutor's misstatement during closing

argument, and he could not rebut the government's assertion that he had been at the probation office. It is true the court did not specifically instruct the jury to disregard the statement, but under these circumstances such an instruction would have highlighted the very thing Phillips wanted obscured, *see Anderson v. Sternes*, 243 F.3d 1049, 1057-58 (7th Cir. 2001), so the remedy actually provided—the prosecutor's substitution of "employment office" for "probation office"—was probably more favorable to Phillips. As for rebuttal, the prosecutor essentially rebutted herself. Although Phillips speculates that the jury would not believe that he was at an "employment office" since no job interview lasts five minutes, there is no reason to believe that the jury would not take the prosecutor at her word.

Anyway, Phillips's argument with respect to factors three and four unduly minimizes the general instruction the jury received to ignore closing arguments if not supported by the evidence. Since we presume that jurors follow such instructions, *United States v. Banks*, 405 F.3d 559, 565 (7th Cir. 2005), the third and fourth factors weigh against Phillips.

The final factor—the weight of the evidence—is usually the most important. *See Hough v. Anderson*, 272 F.3d 878, 903 (7th Cir. 2001); *Howard v. Gramley*, 225 F.3d 784, 793 (7th Cir. 2000). Here, Phillips argues that the two references to his criminal history were especially damaging because, he maintains, the prosecution's case was not very strong. Phillips argues that the case against him was based almost entirely on Crayton's testimony and that the individual pieces of corroborating evidence had innocent explanations. The argument is strained, however. Admittedly, the only real evidence for the first robbery on January 8 (of which Phillips was acquitted) is Crayton's testimony, but the circumstantial evidence surrounding the other crimes is quite strong and supports Crayton's testimony that the two were acting together to commit the robbery and attempted robberies. Videotape evidence and testimony by others put both men together all day January 15, both before and after the attempted robberies. Testimony and DNA on the cigarette suggests Phillips joined Crayton to survey the target of the second attempt. Videotapes and fingerprints linked Phillips to the purchase of the implements of the robbery on January 16, which were abandoned with the getaway car he borrowed from his aunt, and testimony and records show a call from his phone to the aunt to ask her to report the car stolen.

Because only one of five factors—whether the defense invited the misconduct—weighs in Phillips's favor, we conclude that the district court did not abuse its discretion in rejecting Phillips's motions for a mistrial. Accordingly, the judgment is AFFIRMED.