# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

Nos. 04-4113 & 04-4173

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

DEXTER ANDERSON, a/k/a DEK,
and VALENCIA Y. PARSONS,

*Defendants-Appellants.*

———————

Appeals from the United States District Court
for the Eastern District of Wisconsin.
No. 03 CR 261—**William C. Griesbach**, *Judge.*

———————

ARGUED SEPTEMBER 7, 2005—DECIDED JUNE 9, 2006

———————

Before CUDAHY, MANION, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* A jury found Dexter Anderson and
Valencia Parsons guilty of several charges stemming from
their involvement in a crack cocaine conspiracy operating in
Green Bay, Wisconsin. Both appeal, claiming that Sixth
Amendment and due process violations occurred during
trial. Anderson also challenges the probable cause for the
warrant used to search his Milwaukee apartment. We
affirm.

## I. Background

After receiving a tip from a confidential informant and conducting some follow-up investigation of his own, Agent Bernard Bolf of the Drug Enforcement Administration ("DEA") arranged a series of controlled drug buys in Green Bay from two crack cocaine dealers known as "Dex" (or "Deck" or "Derek Mitchell," among other names) and "Ebony." Bolf believed "Dex" and "Ebony" to be Dexter Anderson and Valencia Parsons. Each of the controlled buys followed the same pattern. Renee Rogers, a crack user cooperating with Bolf, would call Dex on his cell phone and say she needed crack. Ebony would deliver the crack, each time arriving in either a 1991 Pontiac Grand Am (registered to Valencia Parsons) or a 2001 Chrysler Town & Country minivan (registered to Dexter Anderson). Rogers would pay Ebony with marked bills, and Ebony would give Rogers the crack, which Rogers would then turn over to Agent Bolf.

After five controlled buys Bolf sought a search warrant for Anderson's Milwaukee apartment and Parsons' Green Bay residence. Though the buys took place in Green Bay, Bolf's investigation linked Anderson to the apartment in Milwaukee. Bolf also had evidence that Anderson orchestrated some of his deals from Milwaukee. In addition, four other informants working with Bolf said they called the same cell phone number Rogers called during the controlled buys to speak with a man named Dex about buying crack. One informant identified Dex as Dexter Anderson; she estimated she bought crack from him over 100 times. Another informant identified Valencia Parsons as Ebony and said that Parsons told him to call "Dek" to buy crack; the same informant said he knew Parsons sold crack for Anderson. Phone records showed that shortly after Anderson received calls from the informants, he called Parsons' phone number. Bolf got his warrant.

A search of both residences turned up incriminating evidence. In Anderson's Milwaukee apartment, officers

found a cell phone matching the number that Renee Rogers called during the controlled buys. The phone also showed that in the hours before agents executed the warrant, Anderson had called Parsons' cell phone. Agents also found over 61 grams of crack in false-bottom containers, $800 in cash in another false-bottom container, two guns, and a vehicle title sale for the 1991 Pontiac Grand Am. At Parsons' Green Bay residence, agents found the cell phone matching the number that Anderson had called, several rocks of crack, a title and license application for the 1991 Pontiac Grand Am in Parsons' name, and a key for the 2001 Chrysler van registered to Anderson. Agents also located the van and recovered cocaine base from inside it.

Anderson and Parsons were charged with conspiracy to distribute crack cocaine, possession with intent to distribute crack cocaine, and distribution of crack cocaine. (Anderson was also charged with being a felon in possession of firearms, but that is unimportant to this appeal.) Agent Bolf testified at trial about his conversations with informants, and most of the informants also testified. The informant who first tipped Bolf off, however, did not testify. In a brief exchange the government asked Bolf about what the nontestifying informant told him:

> Q: In the winter of 2002 or thereabouts, did you receive information from an informant about a person with the nickname or name Deck or Dex?
>
> A. Yes, I did, about November, December of 2002.
>
> Q: And at the time you received that information from that informant about Deck or Dex, did you know immediately who that was?
>
> A: No, I did not.
>
> Q: Was your information that a Deck or a Dex was an individual who sold drugs, though?

> A: Yes. The individual had told me that Deck was coming. I'm sorry. The individual told me that Deck was an individual coming up to Green Bay and having crack cocaine sold by a young female he called Ebony from various hotels in the area.

Five witnesses—four of whom either used or dealt and bought drugs directly from the defendants—identified Anderson and Parsons as Dex and Ebony. These witnesses identified the drugs they purchased as crack. Bolf also identified the drugs from the controlled buys as crack. The parties stipulated that a government expert would testify that the evidentiary substances he tested were cocaine base, and the judge read the stipulation into evidence. During closing argument, however, the prosecutor mischaracterized the stipulation several times, telling jurors that the parties agreed the substance was crack.

The jury convicted Anderson and Parsons on all counts, although Parsons was found guilty of conspiring to distribute only five grams of crack, rather than the fifty or more grams for which she was charged. Anderson was found guilty of conspiring to distribute fifty or more grams of crack. The judge sentenced Anderson to twenty-five years, based in part on the twenty-year minimum applicable to a defendant with Anderson's criminal history who is convicted of crack offenses. Both Anderson and Parsons appeal, with Parsons seeking a new trial and Anderson seeking a new trial or (at least) a new sentence.

## II. Discussion

Anderson and Parsons raise several issues between them. Both argue that Agent Bolf's testimony about his conversations with the confidential informant who did not testify was inadmissible hearsay and violated their Sixth Amendment right to confront witnesses against them. They also argue that the prosecutor's mischaracterization of the

parties' stipulation about drug type misled the jury into thinking it did not need to determine the type of drug in question. Parsons individually makes a due process claim based on what she asserts is the cumulative prejudicial effect of the following: (1) the failure to sever her trial from Anderson's, (2) a witness's reference to having seen a "booking photo" of Parsons, and (3) Bolf's testimony about conversations he had with the informants who were called to testify. Finally, Anderson claims that the search warrant for his Milwaukee apartment was not supported by probable cause.

## A.  Sixth Amendment Rights

Bolf testified to information provided by the confidential informant who first tipped him off about Dex and Ebony's drug business, but this particular informant never testified at trial. Anderson and Parsons argue that this hearsay testimony violated their Sixth Amendment right to confront the witnesses against them. They failed to object below so we review only for plain error. *See United States v. McCaffrey*, 437 F.3d 684, 690 (7th Cir. 2006). To win reversal under the plain error test, Anderson and Parsons must first show there was error, that it was plain, and that it affected their substantial rights. *United States v. Cotton*, 535 U.S. 625, 631 (2002).

The government concedes that eliciting testimony from Bolf about what the nontestifying informant told him about Anderson and Parsons violated their confrontation rights. *See Crawford v. Washington*, 541 U.S. 36 (2004); *see also United States v. Silva*, 380 F.3d 1018, 1020 (7th Cir. 2004). Accordingly, Anderson and Parsons have only to show an effect on their substantial rights, meaning the outcome of the trial was influenced by the error. If they do, we may exercise our discretion to reverse, but will do so only if the error "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Cotton*, 535 U.S. at 631-

32. We have sometimes put this last part of the test differently, requiring a "miscarriage of justice" before a plain error will warrant reversal. *See, e.g.*, *United States v. Bonner*, 440 F.3d 414, 416 (7th Cir. 2006) ("[Plain] error is not correctable without proof that intolerable prejudice or a miscarriage of justice has occurred." (quotations omitted)). If there is a serious risk that an innocent person has been found guilty, *United States v. Paladino*, 401 F.3d 471, 481 (7th Cir. 2005), or if there is closely contested evidence on both sides of an issue, *United States v. Westmoreland*, 240 F.3d 618, 635 (7th Cir. 2001), we will reverse under the plain error standard. There is no plain error when the defendant would have lost anyway, *see, e.g.*, *United States v. Raney*, 342 F.3d 551, 559-60 (7th Cir. 2003); *United States v. Hernandez*, 330 F.3d 964, 969-70 (7th Cir. 2003), and this case is a good example of that principle.

The evidence against Anderson and Parsons, even absent the hearsay, was overwhelming. Five witnesses identified Anderson and Parsons as Dex and Ebony and testified that the two repeatedly sold crack cocaine. Renee Rogers, for instance, testified that she met Anderson personally and that he went by the name "Dex." Rogers described how she bought crack cocaine from Dex for personal consumption and also middled deals for him. Rogers identified Ebony—Parsons—as the person who usually delivered the crack to her. Likewise, Mendell Campbell, an admitted crack dealer, identified Anderson as one of his suppliers and testified that Anderson used the alias "Derek Mitchell" for his drug sales in Green Bay. Campbell identified Parsons as Ebony and testified that Anderson supplied her with crack, too. Lakina Campbell, Mendell Campbell's wife, also identified Parsons as Ebony and testified that Anderson supplied her husband with crack, which Parsons sometimes delivered.

Lisa Larson, a self-described crack addict, testified that she bought crack from Anderson, whom she knew as "D."

According to Larson, sometimes Parsons, who went by the name "Ebony," delivered the crack. Finally, Alexander Richard testified that he bought crack from Anderson, whom he knew as Dex, both for personal use and resale. Richard said Parsons, whom he knew as Ebony, would sometimes deliver the crack to him. At least three of the witnesses—Rogers, Larson, and Richard—called the same cell phone number to place their orders. Police found that cell phone in Anderson's apartment along with over fifty grams of crack, two electronic scales (one with cocaine residue on it), inositol (a common cutting agent for cocaine), a large amount of cash, and two loaded guns. Parsons had crack in her apartment and the key to the 2001 Town & Country minivan used to deliver drugs during the controlled buys. The van had crack in it, too. Anderson and Parsons were doomed even without the hearsay testimony; they cannot pass the plain error test.

## B. Prosecutor's Misleading Statements During Closing Arguments

The prosecution had the burden of proving the substances Anderson and Parsons dealt were crack. The parties stipulated that the government's expert would testify that the evidentiary substances he tested were cocaine base. But at closing, the prosecutor mischaracterized the stipulation, telling the jury no less than four times that Anderson and Parsons stipulated that the substances they dealt were crack. Since not all cocaine base is crack, *see United States v. Edwards*, 397 F.3d 570, 571 (7th Cir. 2005), Anderson and Parsons now claim that the prosecutor's closing argument misled the jury into believing it did not need to determine drug type. That, they say, violated their due process rights.

Anderson makes the additional argument that even if the mischaracterization is not grounds for a new trial, his

sentence was adversely influenced by this error. Because of his criminal history, Anderson was subject to a mandatory minimum sentence of twenty years for dealing crack. Without the finding that the drug was crack, his sentence would have been lower.

Again, Anderson and Parsons raise this issue for the first time on appeal, so our review is for plain error. Again, the government concedes error. Anderson and Parsons must show the outcome would have been different without the prosecutor's misstatements during closing argument. *United States v. Bowman*, 353 F.3d 546, 550 (7th Cir. 2003). Improper statements during closing argument are rarely reversible error. *Id.* To determine whether the prosecutor's improper comments deprived Anderson and Parsons of a fair trial, we consider the following factors, in the context of the entire record: (1) the nature and seriousness of the misconduct, (2) the extent to which the defense invited the comments, (3) the defendants' opportunity to counter the prejudice, (4) the extent to which a jury instruction cured the prejudice, and (5) the weight of the evidence supporting the conviction. *Id.*

In light of the record as a whole, we conclude that the prosecutor's misstatements during closing argument did not prejudice Anderson and Parsons. This is not to say the mischaracterization of the stipulation was not a serious error; it is never appropriate for a prosecutor to tell jurors that an open factual question is no longer at issue, unless it is true. It was not true here and the prosecutor's statements were entirely improper. There is also no doubt that the defense did not invite the prosecutor's comments. On the other hand, Anderson and Parsons had a clear opportunity to counter the prejudice. For starters, they could have objected to any one (or all) of the prosecutor's mischaracterizations of the stipulation. They also could have straightened the matter out in their own closing

arguments. They could have asked the judge to give a curative instruction. They took none of these steps.

In any event, the judge instructed the jury that it had to find beyond a reasonable doubt that the substances in question were crack cocaine. The special verdict form also made it clear that jurors were to decide whether the substances in question were crack. The judge gave the standard instruction that the prosecutor's closing argument was argument, not evidence. Moreover, the stipulation itself was read into evidence, so jurors knew its actual terms; they were instructed that if the prosecutor's argument contradicted the evidence, the evidence controlled.

Beyond that, the evidence convincingly established that Anderson and Parsons dealt crack, so the result of this case would have been no different without the prosecutor's misstatements. We have repeatedly held that the government can prove a substance is crack by offering testimony from people familiar with the drug, including those who sell or use crack, since they are the real experts. *E.g.*, *United States v. Booker*, 260 F.3d 820, 824 (7th Cir. 2001); *United States v. Linton*, 235 F.3d 328, 329-30 (7th Cir. 2000); *United States v. Bradley*, 165 F.3d 594, 596 (7th Cir. 1999). Here, four admitted crack users or dealers testified that they bought crack from Anderson and Parsons. Also, Mendell Campbell's wife, Lakina, who was familiar with crack, testified that she saw the substance her husband was getting from Anderson and Parsons and it was crack. Finally, DEA Agent Bolf testified that the drugs in question were crack. Given the substantial weight of this evidence, the mischaracterization of the stipulation during closing argument cannot have affected the outcome; the government satisfied its burden of proving beyond a reasonable doubt that Anderson and Parsons were dealing crack. *See Bradley*, 165 F.3d at 596 (noting that by itself the testimony of those experienced with crack is enough to establish that the substance was crack).

### C.  Parson's Claim of Cumulative Errors

Parsons argues that the cumulative prejudice of three additional errors denied her a fair trial. Like her other claims, Parsons raises this one for the first time on appeal, so our review is for plain error. First, Parsons claims her trial should have been severed from Anderson's. There is a presumption, however, that coconspirators will be tried jointly, *United States v. McClurge*, 311 F.3d 866, 871 (7th Cir. 2002), and to overcome that presumption, Parsons must show actual prejudice, *United States v. Wilson*, 237 F.3d 827, 835 (7th Cir. 2001). She argues she was prejudiced by the spill-over effect of evidence about the informants' long-standing relationships with Anderson, buying drugs for use or resale. But Parsons delivered the drugs in the five controlled buys and witnesses testified that they dealt with her, too. There was crack cocaine in her apartment and in the van that was linked to the drug sales, to which she had the key. Cell phone records showed she communicated with Anderson often. Any spill-over evidence could hardly have tipped the scales against her.

Parsons also contends that when Anderson took the stand and testified that "Derek Mitchell" is actually someone else—not him—and that Parsons was dating Derek Mitchell, she was effectively forced to fend off two prosecutors. Parsons argues that she had to choose between adopting the government's theory that her codefendant Anderson was Derek Mitchell or Anderson's theory that Derek Mitchell was someone else. Why? Parsons' defense was that she was not Ebony and she did not sell drugs. Whether "Derek Mitchell" was Anderson's alias or an unrelated third party had no bearing on her defense that she was not Ebony. At any rate, a showing of actual prejudice requires that Parsons did not have a fair trial, not that she would have had a better shot in a separate one. *United States v. Hughes*, 310 F.3d 557, 563 (7th Cir. 2002). The joint trial did not prejudice Parsons.

Parsons also contends that a witness's mention of having seen a "booking photo" of Parsons was prejudicial, especially because the judge did not give a curative instruction. But the witness corrected himself on cross-examination and stated that the photo was from a government-issued identification card, not a booking photo. Parsons' attorney reiterated the point during closing argument: "[Y]ou heard the reference to a mug shot. But there is no mug shot of Valencia Parsons. She's not that kind of person. It was a Government I.D. application."

On this point, Parsons cites *United States v. Reed*, 376 F.2d 226 (7th Cir. 1967), but the case is distinguishable. *Reed* involved repeated references to an investigator's use of the defendant's "mug shots" taken in prison, and the prejudice to the defendant flowed from the fact that the photos in question actually *were* prison mug shots of the defendant. This court held that although objections to the "mug shot" references were sustained, the damage to the presumption of innocence was done. *Id.* at 228. Here, unlike in *Reed*, the single reference to a "booking photo" of Parsons was corrected on cross-examination, and the jury was reminded of the correction during closing argument. The judge gave no curative instruction because none was needed. No prejudice resulted.

Finally, Agent Bolf testified about statements made to him during his investigation by three of the informants who testified at the trial. Parsons maintains that this, too, was prejudicial error. She argues that the informants' statements to Bolf were hearsay and nothing more than "a back-door attempt" by the prosecutor to bolster the credibility of "admitted drug users and dealers" who testified for the government seeking "consideration or immunity for their testimony." If so, then there was no error in the first place; prior consistent statements of a testifying witness are admissible for this purpose and are not hearsay. *See* FED. R. EVID. 801(d)(1)(B); *United States v. Green*, 258 F.3d 683,

690-92 (7th Cir. 2001); *United States v. Anderson*, 303 F.3d 847, 858-59 (7th Cir. 2002). All three informants testified at trial, were subjected to cross-examination, and their credibility was attacked. Regardless, there was no prejudice. No fewer than five witnesses familiar with the defendants' crack dealing told such similar stories that the evidence supporting guilt was overwhelming even without Bolf's testimony about the informants' statements to him.

### D.  Probable Cause for the Search Warrant

Finally, Anderson maintains that Bolf's affidavit in support of the application for a search warrant for Anderson's Milwaukee apartment did not establish probable cause. He claims there was no reason to believe that a search of his Milwaukee residence would turn up any contraband. He notes that the Chrysler van was registered to a Dexter Anderson at a different Milwaukee address and the drug running was going on in Green Bay. We review determinations of probable cause de novo. *United States v. Sidwell*, 440 F.3d 865, 868 (7th Cir. 2006).

The probable cause inquiry is practical, not technical, and we consider the totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 230-31 (1983). Where, as here, an affidavit is all that was presented to the issuing judge, the warrant's validity rests on the strength of the affidavit. *United States v. Peck*, 317 F.3d 754, 755 (7th Cir. 2003). Probable cause does not require direct evidence linking a crime to a particular place. *United States v. Lamon*, 930 F.2d 1183, 1188 (7th Cir. 1991). Instead, issuing judges are entitled to draw reasonable inferences about where evidence is likely to be found given "the nature of the evidence and the type of offense." *Id.* (quotation omitted). In the case of drug dealers, evidence is often found at their residences. *Id.* Here, we evaluate whether the affidavit gave the magistrate judge information that suggested a "fair probability that contraband or evidence of a crime" would be

found at Anderson's Milwaukee apartment. *Gates*, 462 U.S. at 238. We are satisfied that it did.

Agent Bolf had substantial evidence that Anderson sold crack. At least two of Bolf's informants identified Anderson as the dealer from whom they purchased crack. One of the two estimated she purchased crack from Anderson over 100 times. That same informant performed five controlled buys under Bolf's supervision. Each time, she dialed a cell phone number that she knew to be Anderson's and spoke with a man whom she believed to be Anderson. Four other informants told Bolf they placed drug orders by calling the same cell phone number. Bolf had evidence suggesting Anderson's link to the Milwaukee area and the particular apartment specified in the warrant application. For example, cell phone records show Anderson often received calls in the Milwaukee area. One of the cars used to deliver drugs to Rogers during the controlled buys was registered to Dexter Anderson in Milwaukee, albeit at an address ten or eleven blocks from the address Bolf wanted to search. But probation records, post office records, energy company records, and the management of the apartment complex all confirmed that Dexter Anderson lived at the Milwaukee address specified in the warrant application. The magistrate judge had probable cause to issue the warrant.[1]

AFFIRMED.

---

[1] Anderson argues that Bolf's affidavit falsely stated that Anderson was selling drugs in Green Bay as far back as January 2000. Anderson apparently was in a Texas prison in January 2000, but his argument on this point requires little comment. The search warrant affidavit says Anderson was involved in a drug-selling conspiracy that dated back to January 2000, not that Anderson was actually selling drugs at that time.

A true Copy:
        Teste:


_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*