In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-3605

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

SAMER J. ALJABARI,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Western Division.
No. 07 CR 50070—**Frederick J. Kapala**, *Judge.*

ARGUED SEPTEMBER 8, 2010—DECIDED NOVEMBER 17, 2010

Before POSNER, MANION, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Appellant Samer Aljabari
hired two of his friends to burn down a tobacco shop
that competed with his father's business. A jury con-
victed Aljabari of arson and conspiracy to commit arson.
On appeal, Aljabari argues that the district court should
have suppressed evidence he contends was seized in
a search of his apartment that went beyond the scope
authorized by the search warrant, that the government

failed to prove that the arson had a sufficient link to interstate commerce to support a federal prosecution, and that the district court committed several errors during sentencing. Finding no error, we affirm in all respects.

I. *Background*

In the early hours of October 4, 2007, the Oregon Smoke Shop, located in the small town of Oregon, Illinois, burned to the ground. There was no doubt that the blaze was intentionally set. The fire marshal discovered evidence of accelerant in the building's remains, and a surveillance video showed a masked man break into the shop, pour a flammable liquid on the floor, and set the building ablaze. As it turned out, the fire was set by Matt McMeekan and Christopher Taylor, whom Aljabari had hired to eliminate the primary competitor to his father's tobacco store in the same small town. Unfortunately for Aljabari, a friend of McMeekan and Taylor told a co-worker about their involvement in the Smoke Shop's destruction, and that co-worker contacted the police.

Following an investigation and a search of Aljabari's apartment, Aljabari was charged with arson and conspiracy to commit arson in violation of 18 U.S.C. § 844(i) and (n). At trial, Taylor and McMeekan both testified that they had burned the Smoke Shop at Aljabari's behest. The jury convicted Aljabari on both counts, and the district court sentenced him to 110 months in prison. He now appeals.

II. *The Search Warrant*

During the course of their investigation into the Smoke Shop's destruction, law enforcement officers obtained a warrant to search Aljabari's apartment. There they discovered, among other things, a can of gasoline and a can of kerosene that Taylor and McMeekan had used to start the fire at the Smoke Shop. Prior to trial, Aljabari moved to suppress all evidence seized during the search, arguing that the warrant suffered from several flaws. The district court granted the motion in part, suppressing the evidence it found had been seized beyond the permitted scope of the search, but the court did not suppress the gasoline and kerosene cans.

A. *Probable Cause*

On appeal, Aljabari first argues that the district court should have found the warrant wholly invalid because the affidavit submitted in support of the warrant application failed to establish probable cause to search the apartment at all. There clearly was probable cause to suspect Aljabari's involvement in the Smoke Shop's destruction, but he argues that there was no specific probable cause to believe that incriminating evidence related to the fire would likely be found in his apartment. The district court rejected this argument, as do we.

We review the affidavit's sufficiency de novo to the extent that it presents purely legal issues of Fourth Amendment doctrine. See *United States v. Olson*, 408 F.3d 366, 370 (7th Cir. 2005), quoting *United States v. Peck*,

317 F.3d 754, 756 (7th Cir. 2003). In applying those principles to a given case, however, we "afford great deference to the decision of the judge issuing the warrant," *United States v. Bell*, 585 F.3d 1045, 1049 (7th Cir. 2009), and we will uphold a finding of probable cause so long as the issuing judge had a substantial basis to conclude that the search was reasonably likely to uncover evidence of wrongdoing, *United States v. Dismuke*, 593 F.3d 582, 586 (7th Cir. 2010).

Law enforcement officials have probable cause to search a particular place where "the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." *Ornelas v. United States*, 517 U.S. 690, 696 (1996); see *Illinois v. Gates*, 462 U.S. 213, 238 (1983) (requiring a "fair probability that contraband or evidence of a crime will be found in a particular place"). This common-sense, non-technical determination is based not on individual facts in isolation but on the totality of the circumstances known at the time a warrant is requested. See *United States v. Brack*, 188 F.3d 748, 755 (7th Cir. 1999), citing *Gates*, 462 U.S. at 238. Those circumstances need only indicate a reasonable probability that evidence of crime will be found in a particular location; neither an absolute certainty nor even a preponderance of the evidence is necessary. See *Gates*, 462 U.S. at 235 ("Finely-tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence . . . have no place in the magistrate's decision.").

Drawing on these general principles, we have made clear that direct evidence linking a crime to a particular place, while certainly helpful, is not essential to establish probable cause to search that place. *United States v. Watzman*, 486 F.3d 1004, 1008 (7th Cir. 2007) (affirming denial of motion to suppress; issuing court could reasonably conclude recipient of child pornography was likely to store it in his home); *United States v. Anderson*, 450 F.3d 294, 303 (7th Cir. 2006) (affirming denial of motion to suppress; issuing court could reasonably infer that known drug dealer was likely, though not certain, to keep contraband in his home); *United States v. Lamon*, 930 F.2d 1183, 1188 (7th Cir. 1991). The necessity of this rule is obvious; often, nothing will *directly* indicate that evidence of a crime will be found in a particular place. For that reason, an affidavit need only contain facts that, given the nature of the evidence sought and the crime alleged, allow for a reasonable inference that there is a fair probability that evidence will be found in a particular place. See *Anderson*, 450 F.3d at 303, quoting *Gates*, 462 U.S. at 238; *United States v. Reddrick*, 90 F.3d 1276, 1281 (7th Cir. 1996).

Applying these principles, the affidavit contained sufficient information to show a fair probability that evidence would be found in Aljabari's apartment. The affidavit provided ample reason to believe that Aljabari had participated in the arson. Aljabari had already asked three people to burn down the Smoke Shop, and he was in regular contact with McMeekan (who was believed at the time to be the masked man setting the fire in the surveillance video) around the time of the

fire. The evidence sought in the application included gas cans, flammable liquids, lighters, burnt clothing, surgical masks, dark clothing, and shoes. It was particularly reasonable to expect to find surgical masks in Aljabari's apartment. A witness claimed to have taken Aljabari to purchase surgical masks about a month before the fire. Nothing in the affidavit made it unreasonable to think that the remaining evidence sought would be found in Aljabari's apartment.

Simple common sense supports the inference that one likely place to find evidence of a crime is the suspect's home, at least absent any information indicating to the contrary. See *United States v. Hendrix*, 752 F.2d 1226, 1231 (7th Cir. 1985) (observing that it is reasonable to infer that a criminal will conceal cash in his home rather than "some less secure and accessible place"); *United States v. Jones*, 994 F.2d 1051, 1055-56 (3d Cir. 1993) ("If there is probable cause to believe that someone committed a crime, then the likelihood that that person's residence contains evidence of the crime increases."); *United States v. Jackson*, 756 F.2d 703, 705 (9th Cir. 1985) (noting that "normal inferences about where a criminal might hide [evidence]" are relevant to the probable cause determination). No such contrary facts are present here—none of the evidence sought would have been physically impossible to store in an apartment, cf. *Platteville Area Apartment Ass'n v. City of Platteville*, 179 F.3d 574, 579 (7th Cir. 1999) ("If you are looking for an adult elephant, searching for it in a chest of drawers is not reasonable."), and nothing in the affidavit indicated that Aljabari had not had an opportunity to place any incriminating evi-

dence in his apartment. See *Jackson*, 756 F.2d at 705 (noting that a suspect's opportunity to conceal evidence may be taken into account in determining probable cause to search).

Insisting that the affidavit needed to contain more specific information about his apartment to establish probable cause for the search, Aljabari relies primarily on the Tenth Circuit's decision in *Poolaw v. Marcantel*, 565 F.3d 721, 725-26 (10th Cir. 2009). In that case, the Poolaws' residence was searched (unsuccessfully) in the course of a manhunt for their son-in-law, who was suspected of murdering a deputy sheriff. The Poolaws brought a federal civil rights suit alleging that the warrant authorizing the search was based on a deficient affidavit. The Tenth Circuit noted that neither the suspect nor his wife lived even part-time with the Poolaws, and nothing in the affidavit suggested that the suspect "had any contact with the Poolaws' property during which time [he] could have hidden evidence" of his crime. *Id.* at 731. Because the affidavit relied on little more than speculation and the Poolaws' family ties to the suspect, the Tenth Circuit concluded that the search warrant was issued without probable cause. *Id.* at 732.

*Poolaw* shows that, the less readily apparent the connection between a criminal suspect and a particular place, the greater the factual support necessary to establish probable cause to search that place. To understand this principle, consider two hypothetical warrant applications. Both contain sufficient facts to show probable

cause that Aljabari helped burn the Smoke Shop, and both request permission to search for burnt clothing as proof of his involvement in the crime. One application seeks, as was actually the case here, a warrant to search Aljabari's apartment. The other seeks a warrant to search the home of an acquaintance. Few, if any, additional facts would be needed to support the warrant to search Aljabari's home. After all, what more likely place to find a suspect's clothes than his own home? See *Hendrix*, 752 F.2d at 1231; *Jones*, 994 F.2d at 1055-56; *Jackson*, 756 F.2d at 705. More facts would certainly be needed to explain why one might expect to find Aljabari's clothing somewhere else, however. *Poolaw* dealt with the latter sort of case, which is why it required a greater showing of fact than is necessary in circumstances such as those now before us.[1]

_____

[1] We decline Aljabari's invitation to follow the Sixth Circuit's divided and non-precedential decision in *United States v. Bethal*, 245 Fed. Appx. 460 (6th Cir. 2007). In that case, the court held that, although law enforcement officials had probable cause to arrest the defendant for his involvement in two drive-by shootings, a state court did not have probable cause to issue a warrant to search the defendant's home for guns. That was because "the affidavit only contained information connecting the appellant to two shootings; it did not include any facts connecting him to drugs or to weapons at his home." *Id.* at 468. The panel majority based its conclusion in part on its belief that, while "drug dealers routinely keep drugs at home," individuals accused of murder "often dispose of the guns utilized in the crime soon afterward." *Id.* This reasoning

(continued...)

When probable cause exists to believe an individual has committed a crime involving physical evidence, and when there is no articulable, non-speculative reason to believe that evidence of that crime was not or could not have been hidden in that individual's home, a magistrate will generally be justified in finding probable cause to search that individual's home. Cf. *United States v. Ressler*, 536 F.2d 208, 213 (7th Cir. 1976) (holding that affidavit indicating that resident of premises was engaged in criminal activity was sufficient to establish probable cause to search those premises). We do not mean to adopt a broad, per se rule allowing a search of an individual's home whenever that individual is suspected of a crime. Nevertheless, our reasoning reflects both the common-sense realization that evidence of crime will often be found in a suspect's home, as well as the substantial deference we must give to a magistrate's finding of probable cause to issue a search warrant.

---

[1] (...continued)

seems to us misguided. It is always possible that criminals will dispose of incriminating evidence prior to a search, but that possibility does not defeat probable cause. The Fourth Amendment does not require certainty that a search will uncover the sought-after evidence; a fair probability is enough. See, *e.g.*, *Gates*, 462 U.S. at 238. It is no surprise, then, that the *Bethal* majority struggled to distinguish many cases, including some from this court, upholding warrants to search homes based on probable cause to believe a resident was a drug dealer engaged in continuing criminal activity.

B. *The Scope of the Search*

Aljabari argues next that the district court should nevertheless have suppressed the gasoline and kerosene cans because they were found in a place outside the scope of the search authorized by the warrant. Aljabari's "apartment" was actually a converted space in the rear storage area of his father's tobacco shop. The warrant authorized only a search of the apartment itself, however, not the entire building. The cans were found in the tobacco shop's loading dock, and Aljabari contends that the loading dock was not part of his apartment. After an evidentiary hearing, the district court denied the request to suppress the gasoline and kerosene cans, concluding that the loading dock was actually part of Aljabari's apartment.

The Fourth Amendment requires that all warrants "particularly describ[e] the place to be searched, and the persons or things to be seized." This requirement helps enforce the probable cause requirement by limiting law enforcement officers' discretion to determine for themselves the scope of their search. *United States v. Sims*, 553 F.3d 580, 582 (7th Cir. 2009). That is not to say that an officer executing a search warrant has no discretion, however. The execution of a warrant will often require some interpretation of the warrant's terms. A warrant that seems unambiguous to a magistrate in the confines of the courthouse may not be so clear during the execution of the search, as officers encounter new information not available when they applied for the warrant. As a result, an executing officer must

interpret a warrant's terms reasonably, but the officer need not give them the narrowest possible reasonable interpretation. See *Hessel v. O'Hearn*, 977 F.2d 299, 302 (7th Cir. 1992). If evidence is discovered in an area later determined to be outside the warrant's scope, then, suppression of that evidence is appropriate unless, in light of the circumstances presented at the time of the search and the limitations in the warrant, the execution of the search in that area was reasonable. See *Maryland v. Garrison*, 480 U.S. 79, 88 (1987) (upholding search because officers' failure to realize that they had searched an apartment not described in the warrant was "objectively understandable and reasonable"); *United States v. Mann*, 592 F.3d 779, 782 (7th Cir. 2010); *United States v. Funderwhite*, 148 F.3d 794, 797 (7th Cir. 1998) (upholding search of van because law enforcement officers "had an objectively reasonable, good-faith belief that the judge had . . . authoriz[ed] such a search"); *Hessel*, 977 F.2d at 302 (finding no Fourth Amendment violation because a reasonable construction of the warrant covered all the items seized). Aljabari's argument for suppression therefore fails if (1) the loading dock was in fact part of his apartment; or (2) if the officers could reasonably (though erroneously) believe it was part of his apartment. The district court concluded that the loading dock area actually appeared to be part of the apartment, and we accept that factual conclusion unless it was clearly erroneous. See *United States v. Bass*, 325 F.3d 847, 850 (7th Cir. 2003), citing *United States v. Jackson*, 189 F.3d 502, 507 (7th Cir. 1999).

Turning to the record of the suppression hearing, we find no error. As noted above, Aljabari's makeshift apart-

ment was actually a converted storage space, with no obvious boundaries between his living space and any space used exclusively by the tobacco shop. In fact, it seems that little separated the two spaces—one could access the apartment via the storage area, and vice-versa, and personal items were found scattered about a number of the rooms searched. Nothing indicated that Aljabari had exclusive access to certain rooms, which might have indicated that only those rooms, but not others, were part of his personal space. And although the gasoline and kerosene cans were found in a part of the building sometimes used as a loading dock (at the time of the search, the loading dock door was blocked), that area was apparently also used as a pantry of sorts. When law enforcement searched the dock, they discovered a discarded pizza box and a refrigerator containing food. There was no refrigerator or kitchen elsewhere in the building, and testimony indicated that Aljabari used the refrigerator, though infrequently. The district court did not clearly err in finding that the loading dock was also being used as part of Aljabari's apartment and that the warrant authorized the search of that area. See *Bass*, 325 F.3d at 850, quoting *United States v. Tilmon*, 19 F.3d 1221, 1224 (7th Cir. 1994).

III.  *Sufficiency of the Evidence*

Aljabari next contends that the evidence presented at trial was insufficient to show beyond a reasonable doubt that the Oregon Smoke Shop was used in any activity affecting interstate commerce, as required for a convic-

tion under 18 U.S.C. § 844(i) and (n).[2] The district court rejected this argument, noting that the main purpose of the Smoke Shop was to sell tobacco and tobacco products, and concluding that a reasonable jury could find the requisite nexus between the building and interstate commerce. When analyzing a claim of insufficiency of the evidence, we view the facts in the light most favorable to the government, making all reasonable inferences in favor of the jury's verdict. We will affirm so long as a reasonable jury could have voted to convict on the evidence presented. See, *e.g.*, *United States v. Jaderany*, 221 F.3d 989, 992 (7th Cir. 2000); see also *Jackson v. Virginia*, 443 U.S. 307, 324 (1979).

The question, then, is what was the government required to prove? The Supreme Court has construed the federal arson statute to protect buildings actively used for a commercial purpose, but not buildings having "merely a passive, passing, or past connection to commerce." *Jones v. United States*, 529 U.S. 848, 855 (2000). Accordingly, we have recognized that all buildings actively used for a commercial purpose, such as restaurants, bars, rental properties, and home offices, " 'possess the requisite nexus with interstate commerce under § 844(i).' " *United States v. Soy*, 413 F.3d 594, 603 (7th Cir. 2005), quoting *Martin v. United States*, 333 F.3d 819, 821 (7th Cir. 2003); see also *United States v. Joyner*, 201 F.3d 61,

---

[2] The arson statute also applies to buildings actually used in interstate commerce, but the indictment did not charge that the Smoke Shop was itself used in interstate commerce.

79 (2d Cir. 2000) (adopting per se rule that rental proper-
ties, bars, and restaurants have a sufficient nexus to
interstate commerce for purposes of the arson statute).

The building housing the Smoke Shop was actively
used for a commercial purpose. The Smoke Shop was,
after all, engaged in the sale of tobacco products at the
time it was destroyed. It was located in a retail space
rented from that space's owner. See *Russell v. United
States*, 471 U.S. 858, 862 (1985) ("[T]he statute only
applies to property that is 'used' in an 'activity' that
affects commerce. The rental of real estate is unques-
tionably such an activity."). The government therefore
had no obligation to introduce *any* additional evidence
to establish the Smoke Shop's connection to interstate
commerce. See *Joyner*, 201 F.3d at 79 ("[A]lthough the
government concedes that it failed to introduce any
direct evidence at trial to show that [the restaurant]
obtained food or beverage from out-of-state sources or
catered to interstate patrons, the jury properly con-
cluded that [it] was part of a broader restaurant
market connected to interstate commerce."). The govern-
ment nevertheless introduced evidence that the Smoke
Shop sold tobacco products and accessories purchased
from out-of-state providers. Under *Soy*, that was more
than enough evidence to allow a jury to conclude rea-
sonably that the Smoke Shop was used in activity
affecting interstate commerce.[3]

---

[3] We have little doubt that the vast majority, if not all, of the
tobacco sold in the Smoke Shop was grown outside of Illi-

(continued...)

Aljabari correctly notes that we have also said, albeit without citing our opinion in *Soy*, that "where a property is actively employed for commercial purposes, the interstate commerce element *may* be met if the connection to interstate commerce is both continuing and substantial." *United States v. Craft*, 484 F.3d 922, 928 (7th Cir. 2007) (emphasis added). *Craft* concerned the arson of a Hells Angels clubhouse that was used for little more than monthly meetings and parties. *Id.* at 929. While club dues were "used to reimburse club members for trips across state lines," *id.*, that was not treated as a use of the building itself. Cf. *Jones*, 529 U.S. at 856 ("It surely is not the common perception that a private, owner-occupied residence is 'used' in the 'activity' of receiving natural gas, a mortgage, or an insurance policy."). There was simply no evidence from which to conclude that the clubhouse itself was actively employed for commercial purposes. *Craft*, 484 F.3d at 929. Thus, the facts in *Craft* presented no opportunity to depart from the rule adopted in *Soy*. The observation

---

[3] (...continued)

nois. Illinois may be known for its agriculture, but certainly not for vast tobacco fields. In 2007, Illinois had only 13 tobacco farms, occupying all of 827 acres. See U.S. Dep't of Agriculture, 2007 Census of Agriculture, at 467 (2009), *available at* http://www.agcensus.usda.gov/Publications/2007/Full_Report/usv1.pdf (last visited Nov. 15, 2010). To put these numbers in perspective, that same year, the United States had more than 16,000 tobacco farms covering more than 300,000 acres. *Id.* at 465.

in *Craft* that a "continuing and substantial" connection to interstate commerce *may* satisfy the arson statute simply did not amount to a new requirement to that effect.[4]

Aljabari's unduly expansive reading of *Craft*—under which even a commercial structure would be protected by the arson statute only if it had a further "continuing and substantial" connection to interstate commerce—would conflict with the Supreme Court's decisions in *Russell* and *Jones*. In *Russell*, the Court held that the arson statute applied to an apartment building consisting of just two units. 471 U.S. at 862. It would be difficult to say that the rental of two apartments has a "substantial" connection to interstate commerce, at least without stripping that word of virtually all meaning. Reading the statute to cover only commercial buildings having a "continuing and substantial" connection to interstate commerce might mean that massive retailers such as Wal-Mart or Sears would certainly be protected, while a great many small businesses might fall outside the statute's scope. Congress clearly has the power to fill such a substantial gap in the statute's coverage. See *Russell*, 471 U.S. at 862 ("[T]he local rental of an apartment unit is merely an element of a much broader commercial market in rental properties. The congressional power to regulate the class of activities that constitute the rental market for real estate

---

[4] It is unlikely that panel in *Craft* intended to reject *Soy*. The opinion did not mention *Soy* and was not circulated to the full court under Circuit Rule 40(e), as would be appropriate when overruling circuit precedent.

includes the power to regulate individual activity within that class."). We see nothing in the statutory language indicating that this gap was meant to be left unfilled.

This conclusion is not undermined by the Supreme Court's post-*Russell* Commerce Clause decisions, as shown by the Court's decision in *Jones*. In that case, the Court expressly considered the effect of *United States v. Lopez*, 514 U.S. 549 (1995), on its previous interpretation of the arson statute. 529 U.S. at 852. "Yet *Jones* did not disturb the Court's holding in *Russell* . . . . In fact, the Court in *Jones* explicitly affirmed its earlier decision . . . ." *Martin*, 333 F.3d at 821.[5]

IV. *Sentencing Issues*

Aljabari challenges the district court's imposition of a sentence above the applicable Sentencing Guidelines range. When reviewing a sentence, we first consider de novo whether the district court committed any procedural error (except, of course, when the alleged error implicates a factual finding). *United States v. Gibbs*, 578 F.3d 694, 695 (7th Cir. 2009), citing *United States v. Mendoza*, 510 F.3d 749, 754 (7th Cir. 2007). Procedural errors include failing to calculate the proper advisory guidelines range, treating the Guidelines as mandatory, selecting a sentence based on clearly erroneous facts,

---

[5] We need not address here the scope of *Jones* or the extent of the required connection to interstate commerce for a non-commercial building.

failing to consider the factors set forth in 18 U.S.C. § 3553(a), or failing to explain adequately a sentence not within the guidelines range. *United States v. Abbas*, 560 F.3d 660, 666 (7th Cir. 2009), quoting *Gall v. United States*, 552 U.S. 38, 51 (2007). If no procedural errors occurred, we review the substantive reasonableness of the sentence only for an abuse of discretion. *Id*.

The district court sentenced Aljabari to 110 months of imprisonment. The sentence was 13 months above the high end of the advisory guidelines range of 78 to 97 months. In explaining its decision to impose an above-guidelines sentence, the district court noted that the motive for the arson was to "drive away a competing business . . . as opposed to something more mundane as trying to collect insurance proceeds." The court was also troubled that the arson "had a direct financial and psychological impact on [the Smoke Shop's owner,] who did not have insurance and had to replace the damaged inventory out of his own pocket." Of particular concern to the court was the "significant planning and scheming" involved in the commission of the offense, as evidenced by the use of a diversion to draw the small local police force away from the Smoke Shop at the time of the fire.[6] The district court also indicated that

---

[6] The night of the fire, Aljabari called his friend Brett Barnes to inform him that an individual was hiding in the bushes near his home, in the hope that Barnes would call the police and draw them away from the Smoke Shop while Taylor and McMeekan set the fire. The first time Aljabari called, however,

(continued...)

it believed that an increased sentence was necessary because of Aljabari's "violent tendencies" and his continued refusal to accept responsibility for his offense. The court concluded that the need for "general deterrence" was strong and that the sentence should "deter people from going to the extreme measure of trying to burn down someone else's business in order to eliminate competition."

On appeal, Aljabari first argues three specific, related procedural errors. First, he asserts that the district court could not take into account the fact that the Smoke Shop's owner had no insurance. Aljabari claims that this was improper because Section 3A1.1 of the Guidelines takes a victim's vulnerability to an offense into account only if, as he claims was not the case here, the victim was unusually vulnerable and the defendant knew or should have known of that vulnerability. See *United States v. Paneras*, 222 F.3d 406, 413 (7th Cir. 2000). Next, Aljabari argues that the court should not have considered his alleged violent tendencies. Those tendencies could not be taken into account, Aljabari says, because the Guidelines already treat arson as a crime of violence. He also insists that the district court erred by considering his refusal to admit guilt among the reasons to

---

[6] (...continued)

Barnes saw nobody outside and did not call the police. Aljabari called again some time later, however, and this time Barnes' friend Lamar Rains—who was playing video games with Barnes and had agreed to help provide a distraction—called the police.

impose an increased sentence. According to Aljabari, this was improper because his refusal to admit his guilt had already been taken into account when he was denied a downward sentencing adjustment for acceptance of responsibility.

A common thread runs through each of these arguments: the belief that, if a certain fact was taken into account (or could not be taken into account) when identifying a defendant's advisory guideline range, a district court may not give further or additional consideration to that particular fact when determining the sentence itself. But that is just a roundabout way of arguing that the Guidelines are mandatory or that a district court lacks any discretion to disagree with them. As should be amply clear to all by now, that is not the law. See *United States v. Booker*, 543 U.S. 220 (2005) (excising provision rendering Guidelines mandatory); *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (noting that courts may vary from Guidelines on the basis of policy disagreements with the Guidelines themselves); *United States v. Corner*, 598 F.3d 411, 415 (7th Cir. 2010) (en banc) ("So long as a district judge acts reasonably . . . the Sentencing Commission's policies are not binding."). If a district court believes that the Guidelines' downward adjustment for acceptance of responsibility is insufficient (for a particular defendant or all defendants in general), it may express this belief by imposing a lower sentence. By the same logic, if a court believes the downward adjustment is too generous, the sentence imposed may reflect that belief instead. Similarly, if the court believes an upward adjustment under the Guidelines is too

severe or not severe enough, it may exercise its sound discretion accordingly. The most that could be said here is that the district court disagreed with the manner in which the Guidelines took into account Aljabari's continued denial of guilt, the harm suffered by Aljabari's victim, and Aljabari's past violent tendencies. Such disagreement with the Guidelines, reflecting the district court's focus on an individual defendant rather than on the Guidelines' broad, generic classifications, is not a procedural error.

Aljabari also argues that the district court abused its discretion when it imposed a 110-month sentence. He notes that in 2008 the median sentence imposed in federal arson cases was 60 months. The median sentence imposed for a particular crime sheds no light on whether the district court abused its discretion in this case. After all, we know next to nothing about the circumstances in which that median sentence was imposed, and a median tells us nothing about the full range of reasonable sentences, both more severe and more lenient.

Aljabari also cites our decision in *United States v. Willey*, 985 F.2d 1342 (7th Cir. 1993), as an example of a similar case in which a substantially lesser sentence was imposed. In that case, Willey pled guilty to hiring three men to burn down a competitor's restaurant, and we affirmed the district court's decision to sentence him to 42 months in prison. *Id.* at 1344-45. Although Aljabari's and Willey's actual crimes may have been similar, the similarities between their cases end there. Aljabari testified in his own defense, perjured himself while doing so, and ac-

cordingly received an upward enhancement for obstruction of justice. Willey never perjured himself and chose instead to plead guilty to his crime. Nor did Willey show signs of violent tendencies or devise a diversion to draw law enforcement away from the scene of his crime. The fact that two different district judges drew different conclusions from different facts over seventeen years apart does not indicate an abuse of discretion by either judge. Reasonable judges are entitled to disagree on the exact sentence appropriate when similar crimes are committed under different circumstances. That's why we apply an abuse of discretion standard, to weed out only those sentences that cannot be explained by reasonable disagreements among principled jurists.

Finally, Aljabari offers a cursory argument that the district court failed to offer "particularized reasoning for its departure." It is not entirely clear whether Aljabari means to allege procedural error or to challenge the reasonableness of his sentence. Procedurally, a district court must adequately explain the sentence imposed and the reason for any sentence outside the advisory Guidelines range. *Nelson v. United States*, 129 S. Ct. 890, 891-92 (2009); *United States v. Jackson*, 547 F.3d 786, 792 (7th Cir. 2008), quoting *Gall*, 552 U.S. at 51. But we have also observed that an above-guidelines sentence "is more likely to be reasonable if it is based on factors sufficiently particularized to the individual circumstances of the case rather than factors common to offenders with like crimes." *Jackson*, 547 F.3d at 792-93 (internal quotation marks omitted); accord, *Gall*, 552 U.S. at 50 ("If [a district court] decides that an outside-Guidelines sentence is warranted,

[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance."). Regardless, either possible assignment of error is belied by the transcript of the sentencing hearing. The district court gave a detailed explanation of its reasoning, pointing to a number of specific facts indicating that Aljabari's crime was particularly egregious. The district court gave a sufficient explanation for its reasonable sentence.

AFFIRMED.