In the

# United States Court of Appeals

## For the Seventh Circuit

No. 18-1529

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

*v.*

JUAN ZAMUDIO,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:16-cr-00251-TWP — **Tanya Walton Pratt**, *Judge*.

ARGUED OCTOBER 23, 2018 — DECIDED NOVEMBER 20, 2018

Before KANNE, HAMILTON, and ST. EVE, *Circuit Judges*.

ST. EVE, *Circuit Judge*. A grand jury returned a third su-
perseding indictment charging defendant Juan Zamudio
with participating in a drug-trafficking conspiracy after law
enforcement executed a search warrant at his home seizing
approximately 11 kilograms of methamphetamine, a loaded
gun, and a cell phone used to make intercepted calls, among
other items. Prior to trial, the district court granted
Zamudio's motion to suppress the seized items. The gov-

ernment brings this interlocutory appeal arguing that the district court erred in granting Zamudio's motion to suppress the evidence seized at Zamudio's home pursuant to a search warrant. We agree and reverse.

## I. Background

In February 2016, the FBI's Safe Streets Gang Task Force began investigating numerous individuals in Indianapolis, Indiana for drug-related activities. The investigation led to judicial authorization to intercept calls from ten different cell phones. During its authorized surveillance, the government intercepted phone calls between the apparent head of the drug-trafficking conspiracy, Jose Zamudio, and his brother Juan Zamudio. (For the sake of clarity, we will refer to defendant as "Zamudio" and to his brother as "Jose.")

Approximately nine months later, the government applied for a search warrant to search 34 separate locations, including Zamudio's residence at 64 N. Tremont Street in Indianapolis. That same day, the magistrate judge approved the application for the search warrant. FBI Special Agent Tim Bates prepared the application and 84-page affidavit, in which he set forth three specific instances of Zamudio's participation in the drug-trafficking conspiracy.

First, in October 2016, Jose called Zamudio to discuss a potential methamphetamine sale to co-defendant Jeffrey Rush. After the call, Zamudio texted Rush and identified himself as a contact for future drug transactions. Rush texted back stating he wanted to purchase two pounds of methamphetamine. Zamudio and Rush then planned to meet at a Kroger grocery store. When they met, surveillance officers observed Rush exit a vehicle and enter Zamudio's vehicle.

Then, Rush exited Zamudio's vehicle with a "basketball-sized red box."

Next, a week after the Kroger transaction, surveillance officers observed Rush and co-defendant Jeremy Perdue enter Jose's residence and exit a few minutes later. Rush and Perdue then went to a Long John Silver's restaurant across the street from where Zamudio worked and met with co-defendant Joseph Coltharp. When Coltharp left the restaurant, police pulled him over for a traffic violation, and, after searching his vehicle, found a package of narcotics on the vehicle's floorboard. In the interim, Zamudio reported back to his brother that the drug transaction had been completed and that he had collected $15,000 from Rush and Perdue.

Last, in November 2016, co-defendant Adrian Bennett called Jose's phone, but Zamudio answered. Bennett and Zamudio discussed a shipment of marijuana. Bennett told Zamudio that he had "some change" (drug proceeds) and also needed "more of his usual" (marijuana). In addition, Bennett stated that he needed "some ice cream" (methamphetamine). Zamudio relayed this information to his brother and then told Bennett to stop by. Bennett said he would do so in an hour.

Agent Bates averred Zamudio's other drug-trafficking activities, including that he had his own customer base in addition to working at the direction of his brother. Further, Agent Bates's affidavit identified Zamudio's address as 64 N. Tremont Street, that he paid utilities at this address, and that his vehicle was routinely parked there overnight. Missing from the affidavit—and the reason for this appeal—was information that drug-trafficking activity actually took place at Zamudio's residence. Nevertheless, Agent Bates stated

that based on his experience and training, drug traffickers "generally store their drug-related paraphernalia in the residences or the curtilage of their residences," and "drug traffickers generally maintain records relating to their drug trafficking activities in their residences or the curtilage of their residences." He further averred that "[t]ypically, drug traffickers possess firearms and other dangerous weapons at their residence to protect their profits, supply of drugs, and themselves from others who might attempt to forcibly take the trafficker's profits or supply of drugs."

## II. Discussion

The government argues that the district court erred in granting Zamudio's motion to suppress because the search warrant established sufficient probable cause to search Zamudio's home. Although Zamudio conceded at oral argument that Agent Bates's affidavit was sufficient to indicate probable cause that he was engaged in a drug-trafficking operation, he argues—as the district court concluded—that there was not a sufficient nexus between the criminal conduct and his home.

We review *de novo* a district court's determination of probable cause and give great deference to the judgment of the magistrate judge who issued the warrant. *United States v. Haynes*, 882 F.3d 662, 665 (7th Cir. 2018) (per curiam); *United States v. Fifer*, 863 F.3d 759, 764 (7th Cir. 2017); *see also Illinois v. Gates*, 462 U.S. 213, 238–39 (1983) ("the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for … conclud[ing] that probable cause existed") (internal quotations omitted). Probable cause for a search warrant exists when the supporting affidavit presents a total set of circumstances creating a "fair probability" that evi-

dence of a crime will be found. *Gates*, 462 U.S. at 238; *United States v. Bradford*, 905 F.3d 497, 503 (7th Cir. 2018).

This circuit has consistently held that, for a search warrant, probable cause "does not require direct evidence linking a crime to a particular place." *United States v. Anderson*, 450 F.3d 294, 303 (7th Cir. 2006); *see also United States v. Aljabari*, 626 F.3d 940, 944 (7th Cir. 2010) ("we have made clear that direct evidence linking a crime to a particular place, while certainly helpful, is not essential to establish probable cause to search that place"); *United States v. Lamon*, 930 F.2d 1183, 1188 (7th Cir. 1991) ("Warrants may be issued even in the absence of 'direct evidence linking criminal objects to a particular site.'") (citation omitted). Rather, issuing judges may draw reasonable inferences about where evidence is likely to be found based on the nature of the evidence and the offense. *United States v. Orozco*, 576 F.3d 745, 749 (7th Cir. 2009); *Lamon*, 930 F.3d at 1188. Thus, an affidavit submitted in support of a warrant application "need only contain facts that, given the nature of the evidence sought and the crime alleged, allow for a reasonable inference that there is a fair probability that evidence will be found in a particular place." *Aljabari*, 626 F.3d at 944. "In the case of drug dealers," this circuit has recognized, "evidence is likely to be found where the dealers live." *Lamon*, 930 F.2d at 1188; *see also Haynes*, 882 F.3d at 666 ("judges may permissibly infer that evidence of drug dealing is 'likely to be found where the dealer[ ] live[s]'") (citation omitted).

Accordingly, our inquiry is whether Agent Bates's affidavit gave the magistrate judge sufficient information suggesting a "fair probability" that evidence of a crime would be found at Zamudio's home. It did. As Zamudio admitted

at oral argument, the affidavit established a reasonable probability that he had engaged in a drug-trafficking operation. *Accord United States v. Correa*, --- F.3d ----, 2018 WL 5780728, at \*8 (7th Cir. Nov. 5, 2018) ("[I]f officers have probable cause to arrest someone, there is a good chance they also have probable cause to search his home for evidence").

Agent Bates had been an FBI Special Agent since January 2009, had participated in federal electronic wiretap investigations, had been involved in drug investigations and searches, and was familiar with the ways narcotics traffickers conducted their business. Based on Agent Bates's experience and training, he asserted that drug traffickers generally store their drug-related paraphernalia and maintain records relating to their drug-trafficking at their residences—a fact we too have recognized. *See Lamon*, 930 F.2d at 1188. He further swore that drug dealers commonly store large sums of drug money and evidence of financial transactions from drug sales in their residences. Drug traffickers, according to Agent Bates, also typically possess firearms at their residences to protect their profits and drug supplies.

Under the circumstances, the issuing judge reasonably drew the inference that indicia of drug-trafficking would be found at Zamudio's home. *Orozco*, 576 F.3d at 749 ("a magistrate evaluating a warrant application is entitled to take an officer's experience into account in determining whether probable cause exists"); *see also United States v. Kelly*, 772 F.3d 1072, 1080 (7th Cir. 2014) (law enforcement's statement "that drug dealers are likely to keep contraband in their residences" and purchase of drugs at different location created a "fair probability" that law enforcement would find drugs at the residence). This conclusion is consistent with our opinion

in *Orozco* where the only support for the link between a high-ranking gang member and the likelihood of locating drug-dealing evidence at his home was the FBI agent's belief informed by his ten years of experience investigating drug-trafficking crimes. *Id.* at 749. In *Orozco*, we concluded that the issuing magistrate judge was entitled to credit the FBI agent's lengthy experience and high degree of confidence that the sought-after evidence was likely to be found at the defendant's home. *Id*. at 750. Similarly, at the time he executed the affidavit, Agent Bates had years of experience in investigating narcotics traffickers and how they conduct their business. He stated that drug traffickers commonly conceal large sums of money and possess firearms at their residences, along with drug-related paraphernalia.

Zamudio believes this ruling will endorse a categorical approach that in every case where a drug trafficker is involved, we will uphold a finding of probable cause to search the drug trafficker's residence. We have repeatedly rejected that approach, *see, e.g., United States v. Wiley*, 475 F.3d 908, 916 (7th Cir. 2007), and we do again now. In the end, probable cause is a practical, common-sense decision best left to the magistrate judge issuing the search warrant. *See Gates*, 462 U.S. at 239.

On a final note, although the district court based its decision, in part, on errors in the affidavit where Zamudio's name was transposed with his brother's name, on appeal, Zamudio does not base his arguments on any resultant confusion. Indeed, despite the occasional name switching, there was no confusion as to materially outcome-determinative facts: Zamudio participated in the drug-trafficking conspiracy; he lived at 64 N. Tremont Street; and, based on Agent

Bates's training and experience, drug traffickers store drug-related items at their residences. This was enough to create a fair probability that Zamudio's home contained evidence of a crime.

Because we conclude that there was probable cause to search Zamudio's residence, we need not address whether the good-faith exception to the exclusionary rule applies.

### III. Conclusion

We therefore REVERSE the district court's decision and REMAND for further proceedings consistent with this opinion.